# CHARLESTON.

RICHARDSON *et al. v.* GRAHAM *et al.*

Submitted Febuary 10, 1898—Decided April 22, 1898.

1.   CORPORATIONS—*Promoter's Rights—Contracts.*

Where a party holds an option on a tract of land for which he agreed to pay six thousand dollars, with a view of organizing a joint-stock company for the purpose of drilling for oil and gas, and and associated others with him to assist in soliciting subscriptions to the stock of said proposed company, and, in so doing, attached a written statement to each subscription paper, proposing to sell said tract of land to the company, when organized, at the price of eight thousand five hundred dollars and after the stock was subscribed, and the company organized, it agreed to purchase said property at said price, said party was entitled to the profit arising from the sale of land to the company. (p. 140).

2.   CORPORATIONS—*Contracts.*

While a corporation cannot ratify contracts made in its name or behalf before it has acquired life, it may exercise its power to make contracts when it comes into existence by accepting or adopting such contracts. (p. 142).

3.   CORPORATIONS—*Promoter's Rights—Stock—Payment for Stock.*

Such company being indebted to the promoter of the company for said tract of land, and said promoter being indebted to the company for stock subscribed for by him, the promoter had the right to pay for his stock by giving the company credit to that extent upon the purchase money due him for said land. (p. 142).

Appeal from Circuit Court, Wood County.

Bill by William Richardson and others against A. B. Graham and others for a receiver and equitable relief. From a decree for plaintiffs, defendants appeal.

*Reversed.*

McClure & Farrier and Turner & Turner, for appellants.

Vanwinkle & Ambler, for appellees.

English, Judge:

A. B. Graham was the owner of an option on a tract of land of ten acres, by which he was entitled to have a conveyance therefor from the executors of T. J. Cook upon the payment of six thousand dollars, and, being such owner, undertook to get up a joint-stock company, with a view of disposing of said option for eight thousand five hundred dollars. The proposed company was to be capitalized at twelve thousand dollars, of which eight thousand five hundred dollars was for said option, and three thousand five hundred dollars for putting down a test well on the property. Graham associated with himself W. H. Ogden, and Lysander Dudley and D. B. Grier, partners, as Dudley & Grier, to assist in obtaining subscriptions to the stock, to be paid out of the two thousand five hundred dollars profits derived by Graham from the sale of the option. A paper was prepared and signed by Graham, to the effect that he was the owner of said option, and that he would sell to the company for eight thousand five hundred dollars, a copy of which paper so signed was attached to three agreements to subscribe for stock, in the proposed company,—one each for Graham, for Ogden, and for Dudley & Grier, who used them in obtaining subscriptions to said company's stock. On November 12, 1890, the company was organized. J. M. McKinney, E. F. Lathrop, A. B. Graham, J. W. Vandervort, and R. J. A. Boreman were made directors. McKinney was elected president, and Graham treasurer. The agreements of the several persons subscribing for stock were accepted by the directors, and the balance due from them was called for. The board on December 30, 1890, accepted the said option at eight thousand five hundred dollars; and on January 10, 1891, in a general meeting of the stockholders, the question with regard to the profit of two thousand five hundred dollars was discussed; and Morehead, one of the plaintiffs (Richardson being

present), asked to have the money in the treasury, three thousand, five hundred dollars repaid to the stockholders who had paid their shares, excluding the twenty-five shares received by Graham, which resolution, together with another made to wind up the affairs of the company, was overruled by a majority, after a full disclosure of the profit in the sale of the option had been made. On January 12, 1891, the board set aside the former resolution accepting the land and option after they had been fully advised of the two thousand five hundred dollars profit, accepting the land. and option at eight thousand five hundred dollars, and directed its attorney to sue for the amounts due on stock which some stockholders were refusing to pay on account of Graham's profit, which they claimed he had concealed from them. On February 14, 1891, Richardson & Morehead, in a directors' meeting moved that Graham and his associates be compelled to pay in money for the twenty-five shares of stock, that they be not allowed two thousand five hundred dollars profit on their purchase, or that the stockholders be relieved from their subscriptions; and these requests were refused by the board of directors. On March 5, 1891, Richardson, J. L. Cramer, E. H. Morehead, and J. M. Circle asked the secretary to call a meeting of the stockholders, to be held at Richardson's office, requesting that said Richardson be permitted to issue the notices, who failed to give notice to many stockholders, among them Graham, Ogden, Grier, and Dudley; and the place said meeting .was to be held was different from that named in the by-laws. At this meeting, the purchase of the land was confirmed at six thousand dollars; and it was resolved not to allow Graham the two thousand five hundred dollars profit, and to protect the interest of the company and of the stockholders.

On the first Monday in April, 1891, a bill was filed in the circuit court of Wood County by William Richardson and others, representing themselves as owners of more than one-third of the stock, alleging that, in the autumn of 1890, Graham undertook to get up a corporation for the purpose of producing oil, and approached the plaintiffs, to induce them to subscribe for stock in the

proposed company, representing that it was being formed
for the mutual interest and benefit of all who should sub-
scribe, and that the operations were to be carried on for
the benefit of all stockholders; that the land mentioned
could be purchased on behalf of the proposed company for
eight thousand five hundred dollars; that Graham had se-
cured an option on the land, and he would give the company
the benefit of such option at eight thousand five hundred dol-
lars. And a subscription paper was shown them, on which
several of the promoters had subscribed large sums,—Gra-
ham, one thousand dollars; Ogden, one thousand dollars;
and Dudley & Grier, five hundred dollars. The plaintiffs in
their bill allege that they were greatly influenced to sub-
scribe for this stock by reason of the fact that the promo-
ters had made such liberal subscriptions, and by their
representations that they were getting up the company for
the common benefit, and that it was never suggested that
said promoters were to pay their subscriptions otherwise
than in money; that Richardson and Cramer asked Gra-
ham directly whether all shareholders were to share
alike, and if the company was being organized for
mutual benefit, or if there was a bonus or profit
for any one, or any advantage to be taken by any of
the parties as against other subscribers; and said
Graham promptly replied that all would share alike, that
it was a common equal square deal, all to be on the ground
floor, with no bonus or advantage to anybody, etc. With-
out following the numerous allegations of a lengthy bill,
the plaintiffs rely mainly for relief on the alleged fact that
the promoters induced them to subscribe by their own
liberal subscriptions, thereby showing their faith in the
venture, and by fraudulently representing that they were
putting in the property at eight thousand five hundred dol-
lars,—just what it cost them,—and no profit was to be re-
alized by them, when in fact they were realizing two thous-
and five  hundred dollars thereby; praying that the affairs
of the company may be wound up, and its assets distrib-
uted among its stockholders as they severally may be en-
titled; that the money paid by plaintiffs may be refunded,
and their subscriptions canceled; that a receiver be ap-
pointed to take charge of the affairs of the company, col-

lect the assets, and distribute the same under the decrees of the court; and that all agreements, etc., might be canceled and set aside; and that A. B. Graham be required to account for moneys paid into the treasury; and for general relief.

This bill was answered by Dudley & Grier, Graham Oil Company, W. H. Ogden, and A. B. Graham, who deny that plaintiffs represent one-third of the stock in said company, and put in issue every material allegiation of the bill, and claim there was no fraud or concealment practiced upon any of the subscribers to said stock; that they subscribed to a paper which on its face showed that the company was to pay eight thousand five hundred dollars for the option held by Graham; and there was no attempt to deceive them in any respect. On November 12, 1891, the complainants tendered an amended bill, and moved to file the same, in which they represent that on November 4, 1891, at a regular annual meeting of the stockholders, seventy-six and one-half shares of the stock being represented, all of the shares but one voted to discontinue the business, close it up, and to ratify and affirm the bringing of this suit; and further allege that the affairs of the company cannot be wound up until the rights of the stockholders have been adjudicated, and the matters at issue in the cause decided; and ask that the words in their original bill, "that the moneys paid by your orators be refunded to them, and their subscriptions canceled," may be stricken out; that the said corporation may be disolved; and for general relief. Graham, Ogden, Lysander Dudley, and Sarah Grier, answering said bill, deny the jurisdiction of the court under the statute to grant the relief prayed for. Numerous depositions were taken, and on the 19th of August, 1896, a decree was rendered in the cause, overruling the exceptions filed to a report made by Levin Smith, commissioner, on February 12, 1896, and directing that the Graham Oil Company recover from the parties mentioned in said report the amounts therein found against them as due the company; and from this decree A. B. Graham and Lysander Dudley obtained this appeal.

The first decree complained of as erroneous is the one entered on the 9th af March, 1895, in which it was decreed

that any and all arrangements, resolutions, and proceedings undertaken by the directors to bind the company or stockholders to pay eight thousand five hundred dollars for the land, which cost only six thousand dollars, are in derogation of the rights of said stockholders, and are not binding upon said company; and that the difference of two thousand five hundred dollars could not properly be charged to said company; and that Graham, Ogden, and Dudley & Grier were bound to pay their respective subscriptions to the stock of said company in money; and that all the assets of the company should be converted into money, and properly distributed. On the 27th of July, 1895, the cause was referred to a commissioner, to ascertain the names of the persons liable for stock of the Graham Oil Company, for what amount each party became so liable, and in what way; second, what amount, if any has been paid by each of the parties so liable as stockholders or otherwise for the stock of said company, and in what way have such payments been made; third, what stockholders or persons liable for stock have failed to pay, in whole or part, the amounts for which they became liable, and what amount is now due by each person on account of such stock; fourth, what persons have paid in full for the amount of stock on which they are liable. A report was made in pursuance of this decree, finding that neither Graham, Ogden, nor Grier & Dudley had paid anything on the stock subscribed by them, This report was excepted to by defendants—First. Because this is a suit at the instance of stockholders and not of a creditor, and it was therefore error to find and report any liability on the part of the defendants, or any of them, or of the estate of D. B. Grier, deceased, to pay for the shares of stock issued to and held at any time by them or any of them, at its full par value in money, in the absence of a contract to that effect or of a statute creating such liability as between stockholders. Second. Because it was error to find and report that there was any liability on the part of the defendants, or any of them, to pay the calls made on shares of stock subsequent to the transfer of said shares by the defendants, or any of them; and it was error, therefore, to find and report such liability to pay the unpaid subscrip-

tions on stock transferred by them, or either of them, prior to the institution of this suit. Third. It was error to find that there was a liability on the part of the defendants, or either of them, to pay unpaid subscriptions on shares of stock issued and reissued by said company. as fully paid up, especially at the instance of stockholders, who had acquiesced in the same. Fourth. It was error to find and report such liability for unpaid subscriptions on shares of stock which had been treated by the company as fully paid up, and on which dividends had been declared and paid by the company. Fifth. Unpaid subscriptions constitute a fund for the benefit of creditors, and not for the benefit of stockholders, and no right is shown on the part of the plaintiff stockholders to enforce the liability of unpaid subscriptions.

The entire controversy in this case grows out of the fact that Graham purchased the ten acres of land in the proceeding mentioned, or obtained an option thereon at six thousand dollars, and, having it at that price, proposed to get up a joint-stock company, and sell it to them at eight thousand five hundred dollars. This he had a perfect right to do if he could get the company after it was organized to accept it at that price. It could not concern the company or any of its stockholders what the property originally cost Graham, if they were willing to take it, and did agree to take it, 'at eight thousand five hundred dollars. After it was ascertained by some of the stockholders that the property cost Graham only six thousand dollars, they seemed to think he ought to have sold it to the company at the same price. The option, however, was Graham's property, and he had a right to sell it for all he could obtain for it. Can we say that Graham deceived the subscribers for stock in this company as to the price he expected the company to pay for the property? Certainly not, when the evidence shows that at the head of the subscription list appeared the following statement in writing: "The real estate contemplated to be operated by the oil company when formed is situated in Pleasants County, W. Va., containing ten acres, and generally described as part of the T. J. Cook estate at Vaucluse, for which I hold the option, and agree to sell all my rights therein to said

company, for eight thousand five hundred dollars, when said company is organized,"—dated October 11, 1890, and signed, "A. B. Graham." So that every subscriber who took stock had an opportunity to read the above statement when he signed the subscription list if he desired, and, if he signed without reading, he had no one to blame but himself.

The circuit court erred in overruling the exceptions to the report of Commissioner Levin Smith, and confirming the same, and in holding that nothing had been paid by A. B. Graham, Ogden, and Grier & Dudley upon their shares of stock in said company, and holding that they were indebted to said company for the stock subscribed for by them. This conclusion is reached when we consider the fact that the company purchased from Graham said ten acres of land, for eight thousand five hundred dollars; and, as to the stock subscribed by Graham, he certainly had the right to give the company credit with the amount of the stock he had subscribed for, instead of requiring the company to pay him the money. He also had the right to pay Ogden and Grier & Dudley for their services in getting the stock subscribed; and to do so by allowing the company credit on the purchase money for the amount of the stock subscribed by Ogden and Grier & Dudley, instead of requiring the company to pay him the money to that extent on the purchase of the lot, which he did. The report of said commissioner was therefore erroneous in finding that nothing had been paid by said parties on the stock subscribed for by them, but should have reported the stock as fully paid up. *Jerman's Adm'r* v. *Benton*, 79 Mo., 148.

Here was a written proposition, signed by A. B. Graham, proposing to sell this property to the company when organized for eight thousand five hundred dollars, which proposition was accepted, and thereby became a contract. So, in the case of *Crump* v. *Mining Co.*, 7 Grat., 353 (sixth point of syllabus), it was held that where the representations contained in a written proposal of sale were in all material respects true, and no fact within the knowledge of the vendors materially affecting the value of the thing sold was suppressed, to the injury of the purchasers, the sub-

sequent failure of the mine in value and productiveness does not impare the right of the vendors to enforce the contract. As to the right of Graham to credit the company for the amount of his stock on the purchase money the company owed him, the authorities say: "It would be too refined a distinction for ordinary purposes to require a subscriber to hand over to the corporation the money which the corporation would be at liberty the next minute to hand back to him, in the purchase of goods, or whatever they might need in the business for which they were incorporated." That Graham clearly had the right to take his pay in stock, see *Coffin* v. *Ransdell,* 110 Ind., 417, (12 N. E. 20), where it is held that "subscriptions to corporation stock need not, in the absence of statutory provisions requiring it, be paid in cash, but any property which the corporation is authorized to purchase, or which is necessary for the purpose of its legitimate business, may be received in payment." Now, it is apparent that there is no obligation on the company, when all of the stock was subscribed, to accept this property at the price of eight thousand five hundred dollars. This was his written proposition; but, when the company was organized and accepted it, the proposition became a contract, and the company was bound to pay this price for it, whatever it cost Graham, While a corporation cannot, according to to the weight of authority, ratify contracts made in its behalf before it has acquired life, it may, under what is, perhaps the prevailing American doctrine, exercise its power to make contracts when it comes into existence, by accepting or adopting such contracts; and that is precisely what was done in this case. In support of this, see Alger, Promoters Corp. §§ 202, 203; *McArthur,* v. *Printing Co.,* 48 Minn., 319, (51 N. W. 216); Mor. Priv. Corp. § 548. The only fraud claimed by the plaintiffs, to have been perpetrated by Graham and his associates in obtaining subscriptions to the stock of said company was in concealing the price paid for the property by Graham; but it is apparent on the face of the record that after the facts were made known, and the company chartered and organized, it contracted to purchase the property for eight thousand five hundred dollars; and although the stockholders, at an

illegally constituted meeting, repudiated the contract, it was nevertheless legally binding upon the company. Yet the court erroneously allowed the stockholders to share in said profit of two thousand five hundred dollars, and refused to allow Graham and his associates credit for said sum of two thousand five hundred dollars. The decrees complained of are, for the reasons aforesaid, reversed and the cause remanded, with costs.

*Reversed.*