### FARNSWORTH v. UNION TRUST & DEPOSIT CO.

### In re R. M. SMITH & CO.

(Circuit Court of Appeals, Fourth Circuit. February 17, 1914.)

### No. 1211.

1. STIPULATIONS (§ 14*)—OPERATION AND EFFECT.

Where, in a bankruptcy proceeding, the parties stipulated that the receiver of a corporation was duly authorized to prove a claim for unpaid stock subscriptions by the bankrupts, the receiver's failure to institute certain proceedings or obtain certain orders or decrees necessary to entitle him to maintain the claim was immaterial; the vital question being whether the bankrupts were liable, as the purpose of the agreement was to save time, trouble, and expense over other less material matters, and it would be construed accordingly.

[Ed. Note.—For other cases, see Stipulations, Cent. Dig. §§ 24-37; Dec. Dig. § 14.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. PARTNERSHIP (§ 162*)—PARTNERSHIP DEBTS—STOCK SUBSCRIPTIONS.

Anything due on stock subscriptions made in the individual names of partners for the partnership account was a partnership debt.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 296–299; Dec. Dig. § 162.*]

3. BANKRUPTCY (§ 340*)—CLAIMS—STOCK SUBSCRIPTIONS—PAYMENT—EVIDENCE.

On the hearing on a claim in bankruptcy on unpaid stock subscriptions by the bankrupts, evidence *held* insufficient to support a finding that a certain lease was taken by the corporation on the subscriptions at an agreed valuation.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 527; Dec. Dig. § 340.*]

4. CORPORATIONS (§ 88*)—STOCK SUBSCRIPTIONS—PAYMENT IN PROPERTY.

To accept property in payment for stock at an agreed valuation required corporate action, and an understanding between the principal stockholders without any corporate action was insufficient.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 337–364, 425–428; Dec. Dig. § 88.*]

Appeal from the District Court of the United States for the Northern District of West Virginia, at Parkersburg, in Bankruptcy; Alston G. Dayton, Judge.

In the matter of R. M. Smith & Co., bankrupts. From an order, in proceedings against the Union Trust & Deposit Company confirming the reduction by the referee of the claim of John W. Farnsworth, special receiver of the Smith-Chapman Lumber Company, he appeals. Reversed and remanded.

Linn, Brannon & Lively, of Glenville, W. Va., and Steptoe, Rixey & Johnson, of Clarksburg, W. Va., for appellant.

Van Winkle & Ambler, of Parkersburg, W. Va., for appellee.

Before KNAPP and WOODS, Circuit Judges, and ROSE, District Judge.

ROSE, District Judge. R. M. and J. H. P. Smith were copartners. They traded as R. M. Smith & Co. They will be called the "bankrupts." In the names of its individual members the copartnership subscribed for 445 shares of the par value of $100 each of the capital stock of the Smith-Chapman Lumber Company. This corporation will be referred to as the "company." It had a short life. It became insolvent less than two years after it was formally organized and a trifle over two years after its certificate of incorporation was issued. A state court ·of competent jurisdiction appointed a receiver for it. He will be called the "receiver." In the bankruptcy proceedings he filed a claim against the partnership estate for $22,500, which he said was the unpaid balance due on the stock subscriptions. The referee reduced his claim to $3,423.75. The order was confirmed by the District Court. The receiver took this appeal.

[1] The trustee says the receiver is not entitled to maintain his claim because certain proceedings had not been previously instituted or certain orders or decrees obtained. During the pendency of the case

below, the parties stipulated that the receiver was "duly authorized to prove his claim for unpaid stock subscriptions in this bankruptcy proceeding, and to prosecute the same." The vital question was whether the bankrupts were liable under any circumstances for the sum alleged to be due by them on their stock subscriptions. The purpose of the agreement was to save time, trouble, and expense over other less material matters. It must be construed accordingly.

[2] The evidence clearly shows that the subscriptions were made for the partnership account, although in the individual names of the partners. If anything is legally due upon them, it constitutes a partnership debt.

The referee and the court below found that the bankrupts had on their subscriptions paid in cash, in supplies, and by taking up a note of the company for $5,000, in all $27,576.25. We see no reason to differ. This leaves but one question in the case.

[3] The trustee says that a certain lease from one McGraw was taken by the company on account of the subscriptions of the bankrupts and others at a valuation of $30,000. If this be true, the receiver was awarded below all, and more than all, coming to him. If it be not true, he has a provable claim for the difference between $44,500, and $27,576.25, or $16,923.75.

On June 20, 1907, the bankrupts agreed with one Chapman to form the company. The bankrupts were to put in property and money to the amount of $31,000, Chapman to the amount of $15,500. The last named was to get one-third of the stock, the bankrupts the other two-thirds. On the next day they executed the certificate of incorporation of the company by which its capital was fixed at $75,000. In August of that year the company actually began business. It was not until November 4, 1907, that the formal meeting for organization was held. At that time the bankrupts subscribed for 445 shares, other nominees of theirs for 55 shares, Chapman for 250. The agreement of June 20th was laid before the stockholders' meeting and by resolution was approved and ratified; that is to say, the company voted that for $31,000 the bankrupts should get two-thirds of its stock and that Chapman, for $15,500, should have the remaining third.

The referee found that it was the original intention to incorporate the company for $46,500, and that it was the subsequent acquirement of the McGraw lease which led to an increase of the capitalization to $75,000. The only evidence in support of this finding is the statement of Chapman when examined as a witness. He said the agreement contemplated his putting up $15,500, the bankrupts $31,000. It was "enlarged by the contract with McGraw for the mill and property, and we placed a nominal value of $30,000 upon it." He, however, expressly testified that when the written agreement was made the McGraw lease was not considered. It had not then been procured. The referee in reaching the conclusion he did obviously lost sight of the chronology. The agreement to form the company was dated June 20th. The incorporators signed the certificate of incorporation on the next day. There is no hint that the McGraw lease was gotten overnight. The agreement and the certificate were parts of one transac-

tion. They were practically contemporaneous. The capitalization named in the certificate had no relation to the lease and was not fixed in contemplation of it, nor is there the slightest suggestion in the proceedings of the meeting at which the company was organized and the stock formally subscribed that any one supposed that the lease and the stock subscription had any connection with each other. The subscription was made, the agreement of June 20th was read and spread at length on the minutes, and was formally ratified. At the close of the minutes there is this entry:

· "It was reported to this meeting that certain of the stockholders of this company had entered into a certain contract for the purchase of certain property, including mill property at Palmer, certain land and contracted certain leases, etc., in relation to the business of this company with one John T. McGraw, which said contract is ratified and approved by this meeting."

This statement implies that the lease was negotiated for the corporation. There is not a word to indicate anything else or other. No copy of the lease is found in the record. Chapman, however, expressly testifies that it was made directly to the company. The company, it will be remembered, had actually begun business three months before the meeting for organization was held. Both the bankrupts were examined as witnesses. Neither of them said anything as to the lease being valued at $30,000, or at any other sum. Mr. R. M. Smith testified that he knew of no agreements between the incorporators, save those spread on the minutes of the meeting. In our view the evidence does not show that any agreement was ever made that the lease should be taken as worth $30,000, or any other sum. Chapman's testimony to the contrary is not reconcilable with the order of events and with what he and others prove to have been actually done. The conclusion at which the referee arrived, that the bankrupts owed $3,423.75, is itself inconsistent with his finding that the lease was taken in payment of stock subscriptions at the sum of $30,000. If it had been, two-thirds of it would have been paid in ·on account of the bankrupts. With the $27,576.25 which they had otherwise paid, the company would have received from them a total of $47,526.25, which would have exceeded by upwards of $3,000, the full amount of the stock subscriptions made in their names. It is true that additional stock to the par value of $5,500 was issued to their nominees and was not paid for by anyone other than themselves, if by them. Even so, the total amount of their subscription did not exceed $50,000 and their payments, if the referee's theory be right, footed up, as has already been stated, $47,576.25, so that their liability would not exceed $2,423.75, which is $1,000 less than the referee found it to be.

[4] Even, however, if there had been some more or less vague understanding between Chapman and the bankrupts that the lease should be taken in full payment of any balance due on their subscriptions, such understanding would not be sufficient. To accept such property in payment for stock at such a valuation required corporate action. There was none.

The trustee says that it is immaterial that the issue of stock for property was not authorized by formal resolution entered in the min-

utes. He relies on Cook on Corporations, § 21, and the cases there cited. In these cases, however, it was satisfactorily shown that corporate action had been actually taken, and it was by mere inadvertence that the resolutions adopted by the corporation had not been entered upon the minutes. Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. 530, 35 L. Ed. 227; Whitlock v. Alexander, 160 N. C. 465, 76 S. E. 538. In both these cases the necessity of corporate action in some form was distinctly recognized. It is not necessary to follow counsel for the trustee in their discussion of Richardson v. Graham, 45 W. Va. 134, 30 S. E. 92, or Bank v. Belington Co., 51 W. Va. 60, 41 S. E. 390. According to their contention, those cases decide that a West Virginia corporation may take property in payment of stock subscriptions; that it may take such property at any value to which it may agree; and that in the absence of a showing of actual fraud such valuation, however excessive, is conclusive. Before the doctrines laid down in those cases become applicable, the corporation must agree to take the property at the valuation. The evidence here does not show that the corporation ever made any such agreement, formally or informally. Individuals as such cannot value property at any sum they see fit and require the rest of the world to accept that valuation as conclusive. Such power, if conferred upon them by the Legislature, is conferred in their corporate capacity. It is an extraordinary grant and should be construed strictly, at least to the extent of insisting upon a substantial compliance with the legislative requirements. However that may be, for the reasons already stated, the order below must be reversed and the case remanded, with directions to allow the appellant's claim for $16,923.75.

Reversed.