# CHARLESTON.

### BANK *v.* BELINGTON COAL AND COKE CO.

Submitted September 9, 1901.  Decided March 8, 1902.

1.  CONTRACT—*Fraud—Mistake—Competent Parties.*
      In the absence of actual fraud or mistake a court of equity will not interfere with a contract made between parties competent to contract.  (p. 76).

2.  CORPORATION—*Purchase of Real Estate.*
      Under section 24, chapter 53, Code, a mining corporation, after it is fully organized, may purchase real and personal estate for the use of such corporation and for its other corporate purposes and business, at such price, upon such terms and conditions, as may be agreed upon by the owners and directors or stockholders of such corporation, and may pay for such property by issuing so many shares of its capital stock to the vendor as are equal in amount at par value to the price agreed upon for such property, but not to exceed its authorized capital.  (p. 78).

3.  PAYMENT FOR STOCK—*Valuation—Fraud.*
      The fact that property so received by a corporation in full payment for stock issued is taken at an overvaluation will not make the holder of such stock liable as for unpaid subscription

until the transaction has first been impeached for fraud upon the corporation.   (p. 81).

Appeal from Circuit Court, Marion County.

Bill by The Merchants & Mechanics Saving Bank of Grafton against the Belington Coal and Coke Company *et als.*   Decree for defendants and plaintiff appeals.

*Affirmed.*

SAMUEL V. WOODS, for appellants.

MELVILLE PECK, FRED O. BLUE, and DAYTON & DAYTON, for appellees.


MCWHORTER, JUDGE:

A. Custer, doing business as A. Custer & Co., took options upon various tracts of land in Barbour and Randolph Counties, aggregating about three thousand acres of coal and coal lands. The price to be paid was about twenty dollars an acre, of which ten *per centum* was to be paid in cash and the residue in three equal annual installments with interest.   Said Custer succeeded in interesting I. V. Johnson, J. N. B. Crim, J. E. Hall, A. G. Dayton, William Watkins, George W. Hoover, W. W. Teter, Floyd Teter and C. F. Teter in said purchases.   On the 26th day of January, 1892, said Hall, Crim, Johnson, Charles F. Teter, Watkins and Hoover filed their agreement with the secretary of state agreeing to become a corporation by the name of The Belington Coal and Coke Company "for the purpose of mining coal, manufacturing coke, selling and shipping the same, buying and leasing lands and mineral rights, constructing tram-roads, shafts, coke ovens and engaging in a general merchandising business, and acquiring such other property and rights and the construction of such other works as may be necessary or advantageous for the proper conduct of said company's business," and subscribed thereto ten shares of stock each, making six-thousand dollars and paid in ten *per centum* thereon and asked the privilege of increasing their capital stock by the sale of additional shares from time to time to five hundred thousand dollars.   On the next day, January 27th, the secretary of state issued to them their charter accordingly.   On the 9th day of February, 1892, the said corporators together with A. G. Dayton and A. Custer, then stockholders, met and organized the

company by the election of said Watkins, Crim, C. F. Teter, Floyd Teter, Dayton, Hall and Hoover to be Board of Directors, which board organized by electing Crim president, Watkins vice-president, Johnson secretary and treasurer and Custer general manager, and at which meeting a proposition was made to the said company, which, together with the action of the company thereon and in relation thereto, are as follows: "Whereas, A. Custer, I. V. Johnson, J. E. Hall, J. N. B. Crim, William Watkins, G. W. Hoover, Floyd Teter, W. W. Teter, C. F. Teter, and A. G. Dayton control a body of three thousand acres of coal and coal land, lying and being in the counties of Barbour and Randolph, State of West Virginia, lying generally on the Tygart's Valley river and Beaver creek; and whereas, the said above named parties have agreed to sell their said interest in and to said three thousand acres of coal and coal land at the price of seventy-three dollars per acre, or at a total of two hundred and nineteen thousand dollars, to this company, and to accept in part payment thereof the paid-up certificates of the capital stock of this company to the amount of one hundred and fifty-nine thousand dollars, to be issued to said parties, in the following sums and amounts, viz: To A. Custer, seventy-eight thousand dollars; to J. N. B. Crim, nine thousand; to C. F. Teter, nine thousand; to W. W. Teter, nine thousand; to Floyd Teter, nine thousand; to A. G. Dayton, nine thousand; to I. V. Johnson, nine thousand; to William Watkins, nine thousand; to G. W. Hoover, nine thousand; to J. E. Hall, nine thousand; equal to one hundred and fifty-nine thousand dollars; and said parties have further subscribed each ten shares to said capital stock, or in all ten thousand dollars.

It is further stipulated that one hundred thousand dollars of the capital stock of this company be sold at a discount, not to exceed twenty per cent., and out of the proceeds of the sale of such stock and the ten thousand dollars subscribed by the said parties, the residue of sixty thousand dollars due upon said lands and coal shall be paid to the parties to whom the same shall be owing, and the residue shall be expended in developing said property, in the opening of mines and the erection and operation of coke ovens, and all other things necessary.

Signed, February 9, 1892, by the above named parties, A. Custer, C. F. Teter, J. N. B. Crim, I. V. Johnson, Floyd Teter, W. W. Teter, A. G. Dayton.

Upon consideration of the foregoing proposition it is unanimously ordered that the same be accepted and spread upon the records of this company, and that in compliance therewith, it is further ordered that A. Custer, general manager of this company, be at once authorized to sell one hundred thousand dollars of the capital stock of this company at a discount below par value, of not to exceed twenty per cent.; that so soon as said capital stock is sold this company will issue to said parties certificates of paid-up capital stock of this company to the amounts set forth in said proposition—that is to say: to said A. Custer, seventy-eight thousand dollars; to I. V. Johnson, nine thousand dollars; to C. F. Teter, nine thousand dollars; to W. W. Teter, nine thousand dollars; to Floyd Teter, nine thousand dollars; to A. G. Dayton, nine thousand dollars; to G. W. Hoover, nine thousand dollars; to William Watkins, nine thousand dollars; to James E. Hall, nine thousand dollars; to J. N. B. Crim, nine thousand dollars, and will out of the proceeds of the sale of said one hundred thousand dollars of the capital stock pay the residue of sixty thousand dollars due for said coal and coal lands, and expend the residue in developing said property at once by opening mines, erecting and operating coke ovens and all other things necessary, and it is further ordered that a certificate be written and signed by the president of this company and attested by the secretary, under the seal of this company, and be delivered to A. Custer, general manager of this company, showing his authority to sell and negotiate according to the above order the said one hundred thousand dollars of the capital stock of this company."

The company proceeded under the management as organized to carry out the object of the organization, and on the 29th of November, 1892, at a meeting of the board of directors the following order was made: "It appearing to the company that it is indebted to A. Custer, general manager of the company, in the sum of three thousand and twenty-one dollars and forty-four cents upon settlement made this day, it is ordered that the company execute, by its president, its note, payable in six months, to the said A. Custer for the said sum, three thousand and twenty-one dollars and forty-four cents." Which note was accordingly executed, bearing date the 3rd day of December, 1892, under the seal of said company by J. N. B. Crim, the president, which note being non-negotiable was sold by the payee, A. Cus-

ter, to the Merchants and Mechanics Savings Bank of Grafton.
The note not having been paid when due and the maker having
become largely indebted to insolvency, the said bank, the holder
of the note, instituted its suit in the circuit court of Barbour
County in behalf of itself and all other creditors of the said
Belington Coal and Coke Company who would come in and join
the plaintiff in the costs of the suit, making all the stockholders
and creditors of said company parties defendant thereto; alleg-
ing the contract taken by the said Custer for the several tracts
of coal lands amounting in all to some three thousand acres at
the rate of twenty dollars per acre, ten *per centum* of the price
to be paid down the residue in three equal annual installments,
with interest, and that he had written contracts for the pur-
chase of the same; that before the incorporation of said com-
pany, on the 23rd of December, 1891, said Custer, as A. Custer
& Co., by a written contract of that date sold to said Johnson,
Crim, Hall, Dayton, C. F. Teter, Watkins, Hoover, W. W. Teter
and Floyd Teter all of said three thousand acres at the price of
forty dollars per acre; that the said purchasers from Custer
thereby assumed to pay and perform all the obligations of A.
Custer & Co. to the land owners according to his several con-
tracts with the original land owners, and in addition thereto
undertook and promised to pay to the said Custer, as A. Custer
& Co. sixty thousand dollars of the paid up capital stock of a
corporation shortly to be formed by the said persons for the
purpose of mining and operating the mines to be opened in said
coal and coal lands; that said contract, of the 23rd of Decem-
ber, was signed by all of said parties and by A. Custer & Co. and
was left with A. G. Dayton, C. F. Teter and J. E. Hall, three
of the parties thereto, for the purpose of being preserved as a
link in the chain of title to said lands to be entered of record
in Barbour and Randolph Counties, but was never recorded
and was still in the possession of said parties or some of them;
and files with the bill what is charged to be a copy of the same;
and alleging the incorporation and organization as hereinbe-
fore set out, and sets up the proposition and acceptance of the
same and the issuance of the ninety additional shares to each
of the stockholders mentioned, reciting the same to have been
fully paid up; and that it appeared from the records of said
corporation that it had fully paid capital stock amounting to
one hundred and seventy thousand dollars and upon the faith

and credit of the stock so pretended to have been paid up the said company contracted a large number of debts amounting in the aggregate, other than the debts to the original land owners, to twenty-five thousand dollars, and that after the company had become so indebted, for the purpose of avoiding the legal effect upon the said stockholders by reason of their holdings of said stock, then said Dayton, Crim, Custer, Charles F. Teter, Floyd Teter and A. B. Brown, who had purchased certain of the stock of I. V. Johnson, entered into a written contract whereby they undertook to agree among themselves that all of the stock of the said corporation should be cancelled or surrendered to the company, except twenty-two thousand dollars thereof, which agreement was without consideration and could not affect plaintiff's rights or the rights of any other creditor of the said company against the stockholders for so much of the stock as it was in full paid up and might appear necessary for the satisfaction of plaintiff and other creditors of the company, and plaintiff set up a note for three thousand and twenty-one dollars and forty-four cents so transferred to plaintiff by Custer; alleging that said company had paid ten *per centum* and no more to the original land owners on said contracts and that the whole of the residue, the sixty thousand dollars, was unpaid and more than a third of it long past due; that said lands with all the improvements thereon were not worth and would not bring the unpaid purchase money; that the company suspended its operations and since the 10th of March it had been wholly insolvent and had recently been sued by a multitude of small creditors whose debts ranged from twenty-five dollars to three thousand dollars, that many executions issued upon such judgments had been returned "No property found," so that a judgment at law against said company in favor of plaintiff would be wholly unavailing; that Custer was a man of insufficient means to pay or to secure the debts and could not pay the same; that said company never held but two meetings of its stockholders, one on February 9, 1892, at which all the stockholders were present, of whom said Crim, Watkins, Dayton, Hall, Hoover, C. F. Teter and Floyd Teter were elected directors, and the second meeting was held on the 23rd of December, 1892, and no other board of directors was ever elected except that A. Custer was, on the 7th of April, 1892, elected in room of Watkins; that the board of directors never held but five meetings, that at the third meet-

ing of directors, on the 22nd of August, 1892, ninety shares of stock, which were theretofore held by Watkins who was deceased and for whom Grace Watkins his wife, was appointed his executrix, had been transferred by the said Grace Watkins to the said company, it was then ordered by the board that said ninety shares be transferred for value to A. B. Brown, and thirty shares of W. W. Teter and ten shares of Johnson's stock were likewise transferred to Brown and ten shares of Johnson's stock were transferred to Moses Brown, and ten shares thereof to John Scrimgour, and ten shares to George B. Rommel; and at the fourth meeting the note, held by plaintiff, was ordered to be executed, and filed with its bill a true copy from the records of said corporation; that W. W. Teter was insolvent and A. B. Brown, Moses Brown, Albert Brown, John Scrimgour and George B. Rommel were non-residents of the State and none of them had any property within the jurisdiction of the court; that all the books and records of said company were in the custody of James E. Hall its secretary; that said company was the owner of two lots in the Town of Belington, which were fully paid for, purchased by it from the Tygart's Valley Mineral and Oil Company and upon which the foundation and basement of a business house had been built; then set out the various other tracts of land which it was the owner, and the judgments against said company; that the judgment in favor of the McCoy Boot and Shoe Company of Wheeling for three hundred dollars was a debt against the defendant company of five hundred and fifty dollars, of which said three hundred dollars was a part, for which A. G. Dayton, a member of the board of directors, had made himself personally liable, and that he procured the judgment of the said company to be confessed by the said Crim, president, without any direction or authority of said corporation, knowing the said corporation to be then insolvent, and by virtue of his office of director said Dayton removed, from a stock of store goods owned by said coal and coke company in its storehouse, to a member of said shoe company a sufficient quantity of said merchandise to pay said debt, for which said Dayton was personally liable, thus giving himself an unjust and unlawful priority over other creditors thus rendered himself liable to other creditors of the corporation for the value of the goods so disposed of by him; that said Dayton and said shoe company then knew that said corporation was insolvent and unable to

pay its debts then past due; that said corporation became insolvent about the 1st of March, 1893, and suspended all operation about the 10th of April, 1893; that said directors though often requested to do so and being personally interested in not doing so had failed and refused to require any of said stockholders to submit to assessments and calls upon the stock held by them to pay the indebtedness of said corporation; and prayed that the Belington Coal and Coke Company be required to answer and say how much of its capital stock had been subscribed for and fully paid up; what persons subscribed for the same, how many shares each took by subscription and what persons had paid in full for the original ten shares; how much stock was issued to the several stockholders altogether, at what date issued to each of them, how much stock was held by each of the stockholders which was not actually paid up in full and when the same was issued; was the paid up stock paid for in money or in property, if in property, what property and at what price was it paid to the said company, how was the property procured, from what persons and at what price; what part of the purchase money, if any, was paid upon said property and by whom paid and what part remained unpaid; what debts did the corporation owe, to what persons indebted and the amount of indebtedness to each person; what property of said corporation had been sold, what money had been collected since the 1st of March, 1893, who sold said property and who received the proceeds thereof, what application, if any, was made of such proceeds and who made such application; what were the debts of the corporation for which the said directors or any of them were personally liable otherwise than as stockholders, and to whom owing, and which directors were so liable; what payments, if any, had been made upon such debts since the 10th of March, 1893, out of the sales of the property of the company; what part of the store goods were delivered to the McCoy Shoe Company upon its debts, the value of such goods, when they were delivered to it, and by whom and to whom delivered; that the stockholders be convened together with all the creditors of the corporation, that its property be sold for the satisfaction of its debts, particularly for the debt of plaintiff, and in the event it should become necessary the directors be required to account for and pay over to the credit of this cause all the money and property of the corporation, which they or any of them have

received or applied upon any debts of said corporation for which they or any of them had become personally liable; and the stockholders severally be required to pay into court so much money upon the capital stock owned by them respectively and not actually paid for in full, so much thereon as might be necessary to pay plaintiff's debt and the debts of such other creditors as might join in the suit; that the affairs of the company be wound up; and for general relief.

At December Rules, 1893, plaintiff filed its amended bill making new parties and reciting several judgments; one in favor of the Glade Fire Brick Company rendered November 13, 1893, for eight hundred and three dollars and sixty-five cents; one in favor of Baer's Sons Grocery Company for three hundred and thirty-five dollars and seventy-two cents, same date; one in favor of J. C. Orrick Son Company for six hundred and fifty-three dollars and fifty-one cents, same date; one in favor First National Bank of Grafton for thirty-five hundred dollars; one in favor of Boyd Porter & Company for five hundred and seventy-eight dollars and sixteen cents; and a decree for S. T. Wilson, administrator of Eliza Wilson, for nine hundred and seventy-five dollars, which decree provided also for the sale, in default of the payment of the sum, of eighty-eight acres of land upon which the said coke company had erected fifteen coke ovens worth about two thousand dollars, and its storehouse, engine house, ice house, barn, coal tipple, its dwelling house and other buildings worth at least two thousand dollars and upon which it had opened its mines and had begun the mining of coal and the making of the coke. Alleging that the judgment for thirty-five hundred dollars, in favor of the First National Bank of Grafton, was confessed in the clerk's office by J. N. B. Crim, the president of the Belington Coal and Coke Company, that said confession was without authority from the board of directors and was upon a debt for which said president Crim, Hall, Dayton, C. F. Teter, I. V. Johnson and A. Custer were personally liable to said bank upon a note of which they were the makers and said judgment was confessed for the fraudulent purpose of giving said bank a preference over the plaintiff and other creditors; that said confession was not only without authority from the board of directors but that the said directors could not give authority under the laws of this State for the reason that all the members of the board of directors were per-

sonally interested in the said debt otherwise than as stock-holders; that said judgment stands as a personal judgment against Crim in favor of the bank and not as a judgment against the Belington Coal and Coke Company. And alleges that the paper writing, a copy of which is made an exhibit of the original bill, and signed by Dayton, Crim, Custer, A. B. Brown, C. F. Teter, Floyd Teter, whereby they undertook to agree that all the stock of said corporation except twenty-two thousand dollars thereof should be canceled and surrendered was not only without consideration among themselves as charged in the original bill but was made with the intent of hindering, delaying, defrauding and deceiving the creditors of the said company and the said several stockholders of the Belington Coal and Coke Company; and alleged that the paper writing referred to in the original bill and dated the 23rd of December, 1891, which was left with A. G. Dayton, C. F. Teter and J. E. Hall and was in the custody of one of them or of the said coal and coke company, had been concealed or destroyed with intent to hinder, delay and defraud the creditors of the company. The said paper, filed as "Exhibit contract" with the original bill is as follows: "I. V. Johnson, J. N. B. Crim, J. E. Hall, A. G. Dayton, Wm. Watkins, George W. Hoover, Worth W. Teter, Floyd Teter and C. F. Teter agree with A. Custer & Co. as follows: Said parties of the first part have this day purchased from said A. Custer & Company a body of about three thousand acres of coal and coal lands, which lie in Barbour County and Randolph County, along the Valley river and Beaver's creek, at the price of forty dollars per acre, out of which price the parties of the first part agree to pay for said A. Custer & Company and to assume all the contracts of the said A. Custer & Company with the parties from whom they purchased the said coal and coal lands, according to the terms of his contracts with each of the said land holders, and to pay the said A. Custer & Company the sum of sixty thousand dollars in the paid-up capital stock of a corporation to be formed by the parties of the first part for the purpose of operating the said coal and coal lands.

"Witness our hands this 23rd day of December, 1891. I. V. Johnson, J. N. B. Crim, Alston G. Dayton, C. F. Teter, Wm. Watkins, G. W. Hoover, W. W. Teter, Floyd Teter, J. E. Hall, A. Custer & Company." Plaintiff filed with their amended bill copies of seventeen deeds for lands made by various parties to

the said coal and coke company, in each of which the vendor's lien was retained for the unpaid purchase money; and prayed that the judgments recovered after the filing of the original bill might be considered as part of the indebtedness of said company mentioned in the original bill and that the said C. F. Teter, Hall and Dayton and the coal and coke company be required to answer the amended bill and produce the paper writing dated December 23, 1891, or account for the loss of it, and for general relief.

The defendants Dayton, Johnson, Hall, Crim, Hoover, Floyd Teter and C. F. Teter filed their joint answer to the original and amended bills and denied that A. Custer, as A. Custer & Co., purchased the coal and coal lands in the bill mentioned, but that it was true that A. Custer took written options from the various owners of said lands aggregating about three thousand acres, that by the terms of the options when the lands were actually sold, if sold at all, ten *per centum* of the purchase money was to be paid in hand and the residue in three annual payments, which options were afterwards assigned and transferred by Custer to the Belington Coal and Coke Company; denied the sale of said lands by Custer to Crim, Johnson and others at the price of forty dollars per acre and denied ever making or signing a contract dated December 23, 1891, but that said Custer having obtained the options proceeded to organize a company to be incorporated, and admitted the incorporation and organization of the company and the proceedings of the directors of February 9, 1892, and the sale of the said land to the said Belington Coal and Coke Company at the price of seventy-three dollars per acre, or a total of two hundred and nineteen thousand dollars, and to have received in part payment thereof the paid up certificates of capital stock in said corporation to the amount of one hundred and fifty-nine thousand dollars, to be issued to the said parties as set out in the "proposition"; that the directors of the corporation accepted in their meeting the proposition aforesaid, and purchased the interests of said parties into said lands at the price of seventy-three dollars per acre to be paid for according to the proposition of the owners; that at a meeting of the directors held on the 22nd of August, 1892, the said corporation issued to the stockholders, who had paid up the stock theretofore subscribed by them to the capital stock, an amount of so paid up capital stock equal

to ten times the amount of stock so subscribed theretofore by
them, which was in each instance made up of their stock by each
of them subscribed and paid to the said company, and the paid
up stock in said corporation which they had severally agreed to
take as part of the purchase money due to them severally for
the said lands so sold by them to the said corporation and that
the Belington Coal and Coke Company, then took conveyances
from the several original owners of said coal and coal lands to
itself as shown by copies of such conveyances filed as exhibits
with the plaintiff's original bill; that the coal and coke com-
pany paid, of the purchase money on the lands for which it re-
ceived deeds, various sums stated in the answer, which was the
first and only purchase money paid upon the lands, said Custer
having paid nothing at the time of taking options or afterwards;
that after the company was organized it proceeded with A. Cus-
ter as general manager to mine coal and manufacture coke, etc.,
expending in all between twenty and thirty thousand dollars;
that the monthly pay roll for wages was reported by Custer to
amount to from three hundred to seven hundred dollars and
occasionally to a greater sum than that and so after the ex-
penditure of eleven thousand dollars of paid up capital stock
subscribed, the corporation for the purpose of carrying out the
object of its incorporation borrowed from the First National
Bank of Grafton five thousand dollars, for which the company ex-
ecuted its negotiable note with J. N. B. Crim, James E. Hall, A.
B. Brown, A. Custer, Floyd Teter, W. W. Teter, I. V. Johnson,
C. F. Teter, Alston G. Dayton and G. W. Hoover as its securities,
and for the said purposes it borrowed from the Merchants Na-
tional Bank of Clarksburg the further sum of thirty-five hun-
dred dollars, for which it executed its note with J. N. B. Crim,
James E. Hall, Alston G. Dayton, Charles F. Teter, I. V. John-
son, Floyd Teter, A. Custer, W. W. Teter and A. B. Brown as
securities, which two sums of money were expended by said cor-
poration under supervision of A. Custer, general manager, and
have long since been paid by surety Crim, who would be en-
titled to his money back from the corporation if it were pos-
ible for it to pay it; that it was true as alleged in the bill that
Crim, president, confessed the two judgments to the banks but
that it was not true that the judgments were confessed without
authority and direction of the board of directors, nor that the

judgments were confessed for the purpose of hindering, delay-
ing or defrauding creditors of the said corporation, but they
were confessed by direction and authority of the board of direc-
tors of the coal and coke company; denied that the note given
to Custer by the corporation for three thousand and twenty-one
dollars and forty-four cents represented the indebtedness to
Custer, but that he represented to the directors that the corpora-
tion was indebted to him in a small sum and that in addition to
paying said debt to him it would take the balance of three thou-
sand and twenty-one dollars and forty-four cents to complete
the block of twenty-five coke ovens, and that on receipt of said
note he would cancel the debt due him and finish the ovens;
that Custer requested them to give him a negotiable note which
was refused by the directors and the non-negotiable note issued
to him and which was not to be paid except out of the profits to
arise as he represented to the directors from the operation of
the mines and ovens, and it was then agreed that he should be
paid out of the first of such profits and he accepted the note
agreeing that it should be so paid.   It is admitted that the Mc-
Coy Shoe Company got some of the goods from the store on
account of its claim against the defendant company, but it is
denied that Dayton ever made himself personally liable for the
debt of the shoe company or that the credit given by the McCoy
Shoe Company was in any wise to the interest or benefit of said
Dayton.   It is denied that the directors of the coal and coke
company knew it to be utterly insolvent and that they shipped
away large quantities of coal and coke which they applied upon
their own individual debts due them from the corporation and
debts of the corporation for which they were personally liable,
on the contrary, the coal and coke shipped, was shipped at a
loss to the company and the proceeds received applied by Custer,
general manager; that the agreement of the 30th of March,
1893, set out in the proceedings of the board of directors where-
by it was agreed to reorganize the company and that the sixty
thousand dollars of stock originally issued to A. Custer should
be canceled or assigned back to the said company and the residue
of said stock, issued to the several stockholders, should be can-
celed, surrendered, or assigned back to the company save twenty
*per centum* thereof, and that upon such reorganization the cap-
ital stock should be limited to twenty *per centum, or* twenty-
two thousand dollars so far as the then holdings of said stock

were concerned, and that new stock might be issued and sold to the extent of one hundred thousand dollars upon the best terms that could be obtained, was never carried into effect, that none of the stock then held by them or at any other time was canceled but the agreement was made in good faith and for the purpose of enabling the corporation to procure money to pay its debts; and denied all allegations of fraud and called for full proof of same; and then proceeded to answer the several interrogatories in plaintiff's original bill propounded to the Belington Coal and Coke Company, stating that eleven thousand dollars of the capital stock was subscribed for and fully paid up; held, twenty shares, or two thousand dollars by Custer and the other nine persons ten shares each as heretofore set out, and the issuance of the one hundred and fifty-nine thousand dollars additional shares; that no stock was held by the said stockholders not fully paid up, that the ten shares each subscribed for by all except A. Custer and the twenty shares by him were all paid in cash, the ninety shares each to all except Custer and one hundred and eighty shares to him were paid for in coal and coal lands at the price of seventy-three dollars per acre, that about six thousand dollars of the purchase money was paid for said lands by the coal and coke company out of the eleven thousand dollars paid up stock, and the five thousand dollars and thirty-five hundred dollars borrowed from the Clarksburg bank and the Grafton bank by the corporation and the residue of the purchase money for said lands was never paid, the greater portion thereof had been sold for the purchase money under decrees and in most instances had failed to pay the cost of suit and residue of purchase money; that respondents were unable to state the debts of the company and to whom they are owing; that personal property belonging to the corporation was levied upon and sold under execution, and they were unable to state the amount of the proceeds and the names of the persons who received them, that proceeds arising from the sale of said coal and coal lands were applied by the court to the payment of costs of suit, expenses of sale, and the purchase money due on the land, and the proceeds of the personal property applied to the debts of the execution creditors; that the directors and stockholders made themselves personally liable as sureties for the corporation for the said two banks' debts which debts had been paid by Crim, one of the sureties, to whom a large part still re-

mained due from his co-sureties, that no payments had been made on any debts for which respondents or any of them were personally liable out of the proceeds of the sale of the property of said company.    As to the exact amount of goods taken back by the McCoy Shoe Company, which goods had been ordered by A. Custer, general manager, without authority, defendants were unable to say; as to the interrogatories in its amended bill concerning a pretended written contract purporting to be dated the 23rd of December, 1891, that no such contract was ever made or delivered to said Teter, Dayton and Hall or either of them.

The Glade Fire Brick Company, J. C. Orrick's Sons Company, Moritz Werner, J. H. Wentz filed their petition in the cause setting up their respective judgments against the defendant company alleging that at the time the coal and coke company was incorporated and at the time it became indebted to petitioners the president and directors thereof knew the said company to be insolvent, that after the election of the first board of directors and officers there was no change in the officers or directors until June, 1894, except that Watkins died and Custer was elected April 7, 1892, as a director in his stead, and on the 29th of November, 1892, the said Johnson resigned and James E. Hall was elected secretary and treasurer in his stead; alleged that the said Crim and Hall were brothers-in-law, that the said Johnson and Crim were related by the marriage of the father of said Johnson to the mother of said Crim, that C. F. Teter was the son-in-law to said Hall, the nephew by marriage to said Crim, the cousin to Floyd Teter, and the cousin and brother-in-law to W. W. Teter; alleging the unlawful preference given on the bank's debt by the confession of the judgments by Crim, and alleges concerning the sale of the lands to the individual parties and by them to the company and the issuing of stock as alleged in the bills, and praying that the stockholders might be made liable to pay into court such part of the stock held by them as might be necessary to discharge the indebtedness of the company, that the confession of the said judgments be held void as to the priority sought to be given and fraudulent as to the creditors of said corporation, that the accounts of the corporation be settled and its indebtedness be ascertained and its property sold and its debts paid so far as possible, and for general relief.

On the 2nd of March, 1898, the cause was heard on the bill and amended bill, process executed on all defendants, upon the joint answer of Dayton and others and upon the general replication thereto, the petition of the Glade Fire Brick Company, and others, general replications thereto, and upon other answers and replications and upon the depositions taken and filed in the case, and upon a motion of C. F. Teter, A. G. Dayton and other defendants to dismiss the bill and amended bill. In consideration whereof the court held that the capital stock of the Belington Coal and Coke Company held by the defendants was fully paid up and that no liability existed thereon against said stockholders, and referred the cause to a commissioner to ascertain and report the real estate owned by the company, the condition of the title, the liens thereon and amounts and priorities and to whom owing, and to report the amount, if any, due from the company to the plaintiff on account of the note for three thousand and twenty-one dollars and forty-four cents, made December 3, 1892, to the defendant Custer, and to report all the assets of every kind and character belonging to the coal and coke company applicable to the payment of its debts, and to ascertain and report all debts owing by the said company and to whom owing and the order in which they are payable out of the assets, and to report the owner of the store run in connection with the business of the company by its manager, Custer, and who liable for the debts and any other pertinent matter.

On the 8th day of May, 1899, the commissioner filed his report, to which report the defendants C. F. Teter, J. N. B. Crim, A. G. Dayton, J. E. Hall, I. V. Johnson and G. W. Hoover excepted to the matter reported under the general order of the court "to report any other matter deemed pertinent by himself, or required by any person interested," because they say the same was not pertinent but on the contrary impertinent and improper matter, in nowise authorized by the order of reference and absolutely in many particulars false and untrue, and absolutely adjudicated by said order so far as said matter was concerned, and asked that the same be stricken from the report as impertinent and improper. It was also excepted to by T. T. Elliott "because it finds the defendant company to be the owner of two lots in Belington belonging to him, and for which the evidence shows said company never had a shadow of right or title, never paid a dollar and had no right and claims no right whatsoever."

On the 3rd day of June, 1899, the cause was finally heard, when the court sustained the exception of Teter, Crim and others to the commissioner's report "in so far as it seeks to or in anyway traverses the judgment of the court heretofore entered herein, and the court in nowise adopts or confirms the finding of facts or the deductions of the commissioner in the pertinent matter reported by him, and the exception of T. T. Elliott is sustained, and the said report in other respects is confirmed." The court found there was due to plaintiffs on note against the coal and coke company four thousand one hundred and eighty-nine dollars and seventy cents including interest to date of decree, but held that there was no liability to the creditors or any of them on the stockholders by reason of the stock issued under its order of August 22, 1892, for one hundred and fifty-nine thousand dollars or any other order, and released them from all liability on account of said stock. From this decree the Merchants and Mechanics Savings Bank of Grafton, Cicero Phillips, J. M. Corley, William Corley and A. Custer creditors of said company appealed to this Court and assigned the following errors: "1st. It was error not to charge the stockholders with liability for the stock which was issued to them under order dated the 22d of August, 1892. 2. It was error to sustain the exception of T. T. Elliott to the commissioner's report. 3. It was error to sustain the exception to the commissioner's report in respect to the pertinent matter. 4th. It was error not to decree the sale of the two lots in Belington as the property of the coal and coke company. 5th. It was error not to compel the stockholders of the said company to pay the capital stock issued to them in pursuance of the purchase of the said three thousand acres of coal and coal land, or so much thereof as was necessary to discharge the liens for sixty thousand dollars of unpaid purchase money upon the land for which the stock was issued. 6th. It was error in the court below not to require the stockholders taking stock under the order of August 22, 1892, to pay the par value hereof, or as much of the par value of such stock as would pay the indebtedness of the corporation thereafter contracted. 7th. It was error not to require the stockholders of said corporation to pay in the purchase money upon the one hundred and seventy thousand dollars worth of stock advertised in their prospectus as paid up."

Was the sale to the Belington Coal and Coke Company of the

three thousand acres of coal and coal lands by A. Custer, C. F. Teter, J. N. B. Crim, I. V. Johnson, Floyd Teter, W. W. Teter, A. G. Dayton and others at the price of seventy-three dollars per acre and the issuance of paid up stock on account thereof to the amount of one hundred and fifty-nine thousand dollars to the said parties legal? If this can be answered in the affirmative, then the prospectus issued and sent broadcast over the country, which is not only proved but admitted to have been issued and sent out, was legitimate. This prospectus, it is claimed by the appellants, was fraudulent and only calculated to deceive. It gives at its head the name and location of the corporation, "Authorized capital five hundred thousand dollars," then follow the names of the officers with a statement that the company "owns three thousand acres in a body or thereabouts of coal and sufficient land to operate the same," etc., with a glowing description of the coal, its qualities for coking purposes, etc., and stating that subscriptions to the capital stock to the value of one hundred and seventy thousand dollars had already been made, and the said one hundred thousand dollars authorized to be sold was to be of the same issue and on the same footing, dated February 15, 1892, and signed by J. N. B. Crim, president. That this prospectus had much to do with securing credit for the company there can be no doubt from the evidence. It seems that none of the parties connected with it had experience in the business except A. Custer. That they had faith in the enterprise there can be little doubt as they assisted the company by their individual endorsements to borrow money to the amount of eight thousand five hundred dollars, for the purpose of pushing forward the work of the company, after paying up in cash their first subscription to stock amounting in all to eleven thousand dollars. If the sale mentioned was legal, then the issuance of the one hundred and fifty-nine thousand dollars of paid up stock was at least technically right and the holders cannot be held for assessments thereon as upon unpaid stock subscribed. The company doubtless expected to be able to sell enough of the one hundred thousand dollars of stock put upon the market at least to clear off the original purchase money of the land, which, if they had succeeded in doing, would probably have made their enterprise a success and they would have held paid up stock in the company in ten times the amount of money they respectively put into it, that is, the eleven thousand

dollars actually paid in and the nine-tenths of their stock would in effect have cost them nothing. If the stockholders cannot be held to pay assessments on the one hundred and fifty-nine thousand dollars stock which they claim is paid up by the sale of the land to the company then the circuit court was right and there is absolutely nothing for the creditors as the assets of the company have all been disposed of including most of the lands which have been sold under proceedings taken by the original vendors to satisfy their liens and the proceeds were insufficient to pay costs and expenses of suit and sale and the liens in full. Section 24, chapter 53, Code, provides: "In no case shall stock be sold or disposed of at less than par in order to increase the capital of any such corporation; but nothing herein contained shall be so construed as to prevent any mining corporation, subject to the provisions of this chapter, from issuing stock or bonds and negotiating the sale of the same in payment of real and personal estate for the use of such corporation, and for its other corporate purposes and business, at such price, upon such terms and conditions, as may be agreed on by the owners, directors or stockholders of such corporation; and any subscriber to the capital stock of any such mining corporation may pay for such stock by the transfer and conveyance to such corporation of real or personal property, or both, necessary for the uses and purposes of the corporation, upon such terms as may be mutually agreed upon." This statute is very broad permitting a sale to be made "upon such terms and conditions as may be agreed upon by the owners, directors or stockholders of such corporation." The proposition of sale was made on the 9th day of February, 1892, after the company was fully organized and competent to contract, and the proposition disclosed the fact that there was unpaid to the original owners of the lands the sum of sixty thousand dollars. In *Richardson* v. *Graham*, 45 W. Va. 134, it is held (Syl. pt. 1): "Where a party holds an option on a tract of land for which he agreed to pay six thousand dollars, with a view of organizing a joint stock company for the purpose of drilling for oil and gas, and associated others with him to assist in soliciting subscriptions to the stock of said proposed company, and, in so doing, attached a written statement to each subscription paper, proposing to sell said tract of land to the company, when organized, at the price of eight thousand five hundred dollars, and after the stock was subscribed,

and the company organized, it agreed to purchase said property at said price, said party was entitled to the profit arising from the sale of land to the company." Here was the sale of an option at an advance of not quite fifty *per centum* over the amount agreed to be paid by Graham, who took the option and sold it to the company and he had paid nothing upon the option, but it was a thing of value and the corporation was competent to contract, and it was a property necessary for the business for which the corporation was organized. Graham's profit on his option was large and the court held that he was entitled to it. In the absence of actual fraud or mistake courts of equity will not interfere with the contracts made between parties competent to contract. In *Crump* v. *U. S. Mining Company,* 7 Grat. 352, it is held: "If the representations contained in the written proposals of sale were in all material respects true, and no fact within the knowledge of the vendors materially affecting the value of the thing sold, was suppressed to the inquiry of the purchasers, the subsequent failure of the mine in value and productiveness, does not impair the right of the vendors to enforce the contract." And in *Coffin* v. *Ransdell,* 110 Ind. 417, (11 N. E. 20)', it is held: "The fact that property received by a corporation in full payment for stock subscription is taken at an overvaluation will not enable a receiver of the corporation to maintain an action against a shareholder as for unpaid subscription, until the transaction has been first impeached for fraud."

In the opinion in that case it is said: "The principle deducible from the authorities already cited is, that even in case of an overvaluation of property transferred to a corporation in payment of shares, the transaction, unless void for some reason, is binding so long as it is not impeached by the corporation, or its assignee; and it can be impeached only for fraud upon the corporation." *Coit* v. *Gold Amalgamated· Co.,* 119 U. S. 343; *Brant* v. *Ehlen,* 59 Md. 1; and in *Philan* v. *Hagard,* 5 Dill. 45, Judge Dillon said: "While the contract stands unimpeached, the courts, even where the rights of creditors are involved, will treat *that* as a payment which the parties have agreed should be payment." In section 46, 1 Cook on Stocks and Stockholders, it is said: "To such an extent is this practice carried of issuing stock for property at an overvaluation, that the investing public and persons who give credit to corporations,

rather expect it, and they no longer rely upon the nominal capitalization of the company. Experience has taught them that they must investigate the real financial condition of the company, and invest or give credit upon that alone." When the stock is issued for cash at less than par parties taking the stock are liable to corporate creditors for the unpaid par value thereof, unless the issue was subsequent to commencing business and the real value was paid into the corporation to enable it to go on with its business instead of becoming insolvent. *Id.* sec. 45. In *Stewart* v. *Railroad Co.*, 41 Fed. Rep. 736: "T. and A., having, for a small sum, purchased a road-bed, the construction of which cost only two thousand dollars, caused a railroad company to be organized, and, with others, became directors thereof, and while in this relation contracted with the directors to sell the road-bed to the company for two hundred thousand dollars cash or bonds, and three million six hundred thousand dollars of the capital stock. The sale was formally ratified at a meeting of the directors, and entered on the records of the company; and afterwards the stockholders unanimously approved the purchase. At the time of the sale there were no stockholders, and the stock thus issued was all that had been subscribed. The company had no property except its charter and the road-bed, and the value of the notes and stock issued to T. and A. had no marketable value. *Held*, that the sale was not fraudulent." Appellant cites the case of *Boynton* v. *Andrews*, 63 N. Y. 93, and other New York cases, where holders of stock, issued for property in payment, are held liable to creditors of the corporation where the property was overvalued. The statute of New York was different from ours, it provided that the trustees of any such company might purchase property "necessary for their business and to issue stock to the amount of the value thereof in payment therefor." And the court's construction of the words "value thereof" meant "the fair valuation of the property." If our statute contained such a healthy provision as that probably this case would not be here. Property should be purchased by corporations at reasonably fair valuation even if paid for in the capital stock of the company. But our statute throws the gate wide open for the sale of stock and purchase of property in payment therefor at such price and on such terms and conditions as contracting parties may agree upon. The effort of plaintiff was to establish the execution or

making of the contract in writing, bearing date December 23, 1891, filed as exhibit "Contract" with the bill and which is hereinbefore copied.

A. Custer in his testimony says there was but one meeting prior to the formation of the company, that meeting was held on the 23rd of December, 1891, that Dayton, Teter, Hall, Crim, Hoover, Watkins, W. W. Teter and Floyd Teter were present, that Mr. Dayton walked the floor and dictated while C. F. Teter wrote the contract between witness and the said gentlemen, which as near as he could remember the exhibit "Contract" filed with the bill, and states that everyone present signed that contract there and that, if he remembered right, it was left with C. F. Teter for safe keeping; that he (Teter) said he wanted to put it on record to show that they had an interest in the leases and to keep the chain of their title, that he had not seen the contract since. W. W. Teter, whose name is to said contract, testified that he was present in Mr. Teter's office at the time the original paper was prepared and signed and all the persons whose names were signed to it were present and signed the paper that day, that his recollection is that A. G. Dayton dictated the paper and C. F. Teter wrote it and this contract is a copy of what that paper contained as he remembered it, and says: "They did that thing as sure as there is a God in heaven and why they deny it I can't see, for they came up and signed it as fast as they could. That is the most vivid thing of the whole matter to me." While on the other hand A. G. Dayton in his testimony denies in the most positive terms that there was any such contract ever executed by him or made to his knowledge, or that they ever bought an interest in the options at forty dollars an acre or any other price. J. N. B. Crim testifies that no such contract was ever prepared that he ever signed, no such sale was ever made as set out in the said contract, that he never heard of such contract or such a sale, or that anybody thought there was such a contract until the institution of this suit, and that he signed no contract of that character. And James E. Hall testifies, "No such contract was ever left in my hands. I never signed such a contract, nor has it any existence." C. F. Teter testified unequivocally that no such paper writing was ever signed by the parties mentioned in said question (being the parties who it was claimed had signed the written contract), and no such paper writing as the purported contract, marked

exhibit "Contract" and filed with plaintiff's bill, was ever signed by the persons purporting to sign the same especially himself, and that no such paper was left with Dayton, Hall or himself to be preserved or recorded.

The conflict of evidence could be no more direct or positive concerning the execution of said contract. The circuit court has decided that the contract was not executed and it seems that a preponderance of the evidence is that way. While two witnesses swear positively to its execution, four swear as positively that it never was executed and all six of the witnesses being among the parties purporting to have signed it. The decided preponderance of evidence sustaining the judgment of the circuit court the Appellate Court cannot disturb its judgment.

From what has been said in the discussion of the question of liability of the stockholders on the one hundred and fifty-nine thousand dollars of stock to creditors, it will be seen that the exceptions taken by C. F. Teter and others to the commissioner's report in relation to the so called "pertinent matter" were properly sustained. And as to the exceptions of T. T. Elliott, the court properly sustained the exception although made by a person not a party to the suit but purchased of the lots involved; as the evidence shows that the lots in Belington were never purchased or paid for by the company, that the manager of the company, A. Custer, did a little work in the way of putting a foundation of a house on the lots, but it is shown that nothing was ever paid upon the price thereof and no such contract existed for the purchase as could be enforced. I see no error in the decree and the same will be affirmed.

*Affirmed.*