# CHARLESTON.

J. J. CONWAY v. G. W. BAILEY et als.

Submitted May 9, 1922.    Decided June 2, 1922.

1.  LICENSES—For Promotion of Corporation not on Dividend
    Paying Basis to Transfer Property to it for More than $500,
    and Sell Stock Other than Upon Subscription Blank Showing
    such Transaction and other Necessary Information is Un-
    lawful.

    Under Acts 1915, chapter 18, if promoters of a corporation
    not upon a dividend paying basis, transfer property to it for
    a consideration of more than five hundred dollars in cash or
    the equivalent in the stocks or securities, it is unlawful for
    them to make sale in this state of any of such stocks or
    securities, until a subscription blank, showing the amount of
    such payment or issue for the property and such other infor-
    mation as the Auditor of this state may deem necessary, shall
    have been filed with the Auditor, and to recognize subscrip-
    tions or applications for such stocks or securities upon other
    than such subscription blanks, signed by the subscriber or
    applicant.    (p. 334).

2.  SAME—Requirement of Subscription Blank Showing Transfer
    of Stock to Corporation is to Prevent Deceiving. or Defraud-
    ing Purchasers of Stock.

    The object of such subscription blank is to set forth the
    facts concerning the transfer of property to a non-dividend
    paying corporation, so that the purchaser of its stocks or
    securities may not be deceived or defrauded.    (p. 334).

3.  SAME—The Term "Property" as Used in Statute Relating to
    Promoters' Transfer to Corporation not on Dividend Paying
    Basis Includes Real and Personal Property.

    The term "property" as used in section four of the act is
    not confined to intangible property or assets, but includes
    property of all kinds, real and personal.    (p. 333).

4.  SAME—Promoters' Transfer of Property for Consideration of
    More than $500 to Corporation is not Unlawful, Although
    Sale of Stocks Thereafter Without Notice Thereof is Unlaw-
    ful.

    It is not unlawful to transfer property to a corporation, not
    upon a dividend paying basis, for a consideration of more
    than five hundred dollars in cash or the equivalent in the
    stocks or securities of the corporation; but it is the sale of

stocks and securities therein, after such transfer, without furnishing the information required by the statute, which is prohibited.    (p. 335).

5.  SAME—*Promoters Selling Land Costing $4,400 for $25,000 to Corporation Not on Dividend Paying Basis and Subsequently Selling Stock in Violation of Statute, Held to Establish Prima Facie a Scheme to Defraud.*

In an action for recovery of damages, based on fraudulent representations alleged by plaintiff to have been made by defendants in inducing him to purchase certain shares of the capital stock in a corporation, proof that defendants acquired certain real estate at a cost of $4400, organized the corporation under the laws of this state with an authorized capital stock of $50,000, and, before it was on a dividend paying basis, conveyed to it the real estate for $25,000 par value of the stock; that, afterward, in violation of section 4, chapter 18, Acts 1915, they made sales in this state of shares of stock in the corporation to others than themselves, including certain shares to the plaintiff, without filing with the Auditor of this state a subscription blank showing the issuance of the stock received by defendants for said real estate and without using such subscription blanks containing such information in making such sales, including that made to plaintiff; that when plaintiff made his purchase, one of defendants falsely represented to him that he had $5000 invested in the corporation and that it was not in debt; that one or more of defendants falsely represented to others who purchased shares of the stock about the same time, at its par value, that they "were getting in on the ground floor"; and that said shares of stock were of little, if any, value, prima facie establishes a scheme or artifice to defraud, and renders the defendants liable to plaintiff for the loss he has sustained thereby. (p. 335).

6.  CRIMINAL LAW—*Declaration in Furtherance of Scheme to Defraud are Competent Evidence Against All Conspirators.*

If it has been prima facie shown that such scheme to defraud was devised by the defendants and jointly promoted by them, then declarations in furtherance thereof, made by any one of them, though the others were not present, are competent evidence against all the parties to the scheme.    (p. 337).

7.  FRAUDS STATUTE OF—*False Declarations by Promoter Regarding Financial Condition of Corporation Bind Declarant, Notwithstanding Statute.*

False declarations regarding the financial condition of such

corporation, made by a promoter thereof to induce the pur-
chase of shares of stock therein, though not in writing, are
binding upon the declarant, notwithstanding the statute of
frauds.   (p. 337).

Error to Circuit Court, Cabell County.

Action by J. J. Conway against G. W. Bailey and others,
in which there was a directed verdict for the defendants,
and plaintiff brings error.

*Reversed and remanded.*

*J. H. Strickling,* for plaintiff in error.

*J. W. Perry, McClure & Winters,* and *Fitzpatrick, Brown
& Davis,* for defendants in error.

MEREDITH, JUDGE:

This is an action for fraud and deceit for the recovery of
$1500, brought by plaintiff against George W. Bailey, Morris
Bailey, John B. Condon, Phil C. Jacks, and Margaret Cham-
pion, executrix of the estate of Jefferson Champion, de-
ceased.   The suit was abated as to the executrix; the other
defendants pleaded not guilty, and after plaintiff had rest-
ed his case, on motion of defendants,   the court excluded
plaintiff's evidence and directed the jury to return a verdict
for defendants.   Plaintiff obtained a writ of error.

The first count avers that defendants by fraud and deceit
obtained from plaintiff $1500 through a purchase of fifteen
shares of the capital stock of Scioto Mining Company; the
second count substantially sets out the same facts but   in
addition charges that defendants in making sale of the stock
of the company violated chapter 18, Acts 1915.   It is aver-
red that on April 24, 1917, defendants, including Jefferson
Champion in his lifetime, purchased certain real estate and
leases, upon which was an old coal mine and rights of way,
in Scioto County, Ohio, for about $4000, to which title was
taken in the name of G. W. Bailey, Trustee; that after-
wards, they devised a scheme to defraud the public, by secur-
ing subscriptions and promoting the distribution and sale of
stocks, and secured a charter from the secretary of state of
the State of West Virginia, under the name of the Scioto

Mining Company, with a capital stock of $50,000; that on May 23, 1917, they met in a stockholders' meeting and organized the corporation, at which meeting, G. W. Bailey, Trustee, offered to transfer to the company the real estate and property mentioned for $25,000 of the stock in the company, to be issued fully paid; that all of the defendants were incorporators and directors in the company, including Bailey; That the proposition was accepted, and the directors were instructed to provide for the transfer of the property and for the issuance of 250 shares of stock; that all of the directors were interested at the time with G. W. Bailey in the real estate, leases and rights of way; that afterward, but on the same day, the directors met, authorized and directed the transfer of 250 shares of stock to be made to Bailey, Trustee, upon a conveyance to the corporation of the property mentioned, and also authorized Phil C. Jacks as the company's exclusive agent to sell the remaining stock on a commission basis of 10 per cent; that before defendants could lawfully transfer the property to the company and take therefor one-half of its capital stock fully paid up, and before the company or its officers could lawfully sell any of the $25,000 of stock issued to them or to Bailey, as Trustee, or could lawfully sell any of the remaining $25,000 of stock in the company, to any one other than themselves, it was their duty under the laws of this state, before offering any of said stock for sale or taking subscriptions therefor, to report to the auditor of this state the facts concerning the transfer of the property for the 250 shares of stock and to secure from the auditor a subscription blank showing the amount of such issuance of stock for property and such other information in connection therewith as the auditor might deem necessary, and to take subscriptions for said stock which they proposed to sell only on blanks furnished them by the auditor; that the defendants while acting as stock-holders and directors had authorized the officers of the company to issue to G. W. Bailey 250 shares of the stock and the officers did so issue it to him, yet it was divided among them, and issued

to them by assignment through G. W. Bailey, and for no other consideration than the transfer by Bailey, Trustee, of the property mentioned; and that thereafter without making any report to the Auditor, and without securing any subscription blanks from him, the defendants, with intent to induce the purchase of the said stock issued to themselves, as well as the treasury stock of the company, especially G. W. Bailey, knowingly and recklessly falsely stated to purchasers, including plaintiff, and at the same time, knowingly and recklessly concealing from such purchasers and plaintiff the facts materially affecting the value of the stock and regarding the property, to-wit: the manner of its organization and the fact that they had secured 250 shares of the stock for said property, and that the corporation owed no debts; that G. W. Bailey had put into the company $25,000 cash and that there was a valuable open mine on the property owned by the company; that the railroad had been paid for laying a switch to the mine, and that in a few days the mine would be in operation paying large dividends; that plaintiff, relying upon the truth of these representations of the defendants, and especially of the said G. W. Bailey, and being in ignorance of the condition of the property, purchased fifteen shares of the stock, paid $1500 therefor, and received the certificates for the stock, which he would not have done had he known the truth about the corporation at the time of the purchase; that the representations of the defendants were false; the mine was an abandoned mine of little or no value; that the company had arranged for a switch to be laid to the mine, and while the amount required to secure the switch, $3900, had been paid to the Railroad Company, yet this money had been borrowed by the company; that the mine and property at the time of the purchase of the stock and thereafter was worthless or practically so, and the stock issued to plaintiff was worthless; that by virtue of the statute plaintiff has a right of action to recover from the defendants the loss he has sustained, amounting to $1500.

At the trial plaintiff introduced in evidence the minutes of the company showing its organization, the election of the

defendants, including Jefferson Champion, now deceased, as directors; acceptance of the offer of G. W. Bailey, Trustee, to transfer the property for 250 shares of the stock fully paid, and authorizing the directors to close the transaction; also the minutes of the Board of Directors meeting held the same day, showing the election of Champion as president, G. W. Bailey, vice-president, Morris Bailey, secretary, and Jefferson Champion as temporary custodian of the company's funds, the office of treasurer being left open until the next regular meeting; that G. W. Bailey presented at the meeting the record of the stockholders meeting, directing the acceptance of his proposition; that he retired from the room, and the remaining directors voted to accept his proposition; that the principal office of the company be located in the office of Phil C. Jacks and Company, room 620 First National Bank Building, Huntington, West Virginia; that Mr. Jacks having retired from the room, the exclusive sale of the stock of the company be placed in the hands of Phil C. Jacks and Company for six months, and that a commission of 10 per cent be paid on all stock sold, which proposition, Mr. Jacks, upon being recalled to the room, accepted.

Plaintiff also introduced the deed made by G. W. Bailey, Trustee, to the company, dated June 11, 1917, which recites: "That, whereas, G. W. Bailey, Trustee, of Huntington, Cabell County, West Virginia, grantor herein, heretofore acquired and took title to the real estate and property hereinafter conveyed, as such Trustee in trust for the use and benefit of and to convey said real estate to Scioto Mining Company," a West Virginia corporation, grantee, and shows that for one dollar and other good and valuable considerations, and in execution of the trust, in accordance with and in fulfillment of the purposes thereof, does grant to the grantee, and then sets forth the property, consisting of a right of way to the D. T. & I. Railway, and other property located in Scioto County, Ohio.

Plaintiff called G. W. Bailey as a witness who testified that he acquired the property described in the deed, as trustee for himself and the other defendants, including Jefferson Cham-

pion, deceased; that the 250 shares were issued to him as trustee, and in turn he transferred to his associates, other than his son, Morris Bailey, each a one-fourth part; that he and his son owned a one-fourth part; that the five paid $4400 for the property; that later the property was sold under a deed of trust given to secure the endorsers, and $1700 was all that was realized for it.

Plaintiff testified that he lived in Huntington; that he bought fifteen shares of stock in the company and paid $1500 for it on the representations of G. W. Bailey; that Bailey told him what a good proposition it was and said it was fine coal, had a mine opened up, they were working on it and they would have it ready to ship coal in about 30 days, and any body who bought stock in it would have all his money back by the first of April, and as soon as the company shipped coal they would start paying dividends; that they didn't owe a cent; that they had given the railroad company a certified check for $3900 to put in a side-track; and that Bailey said that he had $5000 in the company; that he had Phil Jacks call him from the hotel and Jacks talked to him about it.    Witness's statement that he did not consider the stock worth anything was stricken out.

Witness, Dr. James W. Engle, was pastor of the First Methodist Episcopal Church in Huntington in 1917.    Defendant, G. W. Bailey was a member of his church.    Witness testified he bought five shares of the stock of the company in August or September, 1917; Phil C. Jacks issued the certificates but G. W. Bailey brought it to witness's attention while he was in the lobby of the Fifth Avenue Hotel, which Bailey was running; that Bailey told him he ought to invest in some coal; that he and Mr. Champion had bought some coal land in Ohio, and had some under lease, and that they were throwing it into a company and selling stock and that the proposition was good and he thought they had the coal contracted up until April 1st, and they were working on the tipple then and would have it finished by the next Friday or Friday week, but as soon as it was finished they would be ready to furnish coal, and that they were  out of debt and

didn't owe anything except what they would owe the hands at next pay day, and that he (Bailey) was treasurer, and his son, who was standing near, clerk of the hotel, was secretary, and they handled all the money, and that Mr. Champion was president, and that on the contracts they had they would be able to pay out by the first of next April. Witness was, in effect, told he was getting in on the ground floor. Upon being asked if he was induced to buy the stock by what Mr. Bailey said to him the court sustained defendant's objection. The answer on the record, which was not permitted to go to the jury, was: "Absolutely so. He said to me to go to Mr. Jacks and let him represent it too, to confirm what he said, and when I did go, he did confirm what Mr. Bailey said, but it was not through the influence of Mr. Jacks that I bought, but through the influence of what Mr. Bailey told me."

Witness, L. A. Daniel, testified that he knew defendant, G. W. Bailey; that a man by the name of Poteet told him that Mr. Bailey was organizing or had organized a company to take over some mining stock, and he went over to see him; that he asked Bailey if the concern was out of debt and if he would let him in on the ground floor, and Bailey said he was letting him in just as he got in and the concern did not owe a dollar. The court refused to permit the witness to explain what was meant by the expression "ground floor".

Morris Bailey testified that he was secretary of the company, and produced and identified the side-track agreement between the company and the D. T. & I. Railroad Company; he further testified that the $3920 provided for in the agreement was paid by certified check; that of this, $2120 was raised by note; that the company never made any subscription blank or filed it with the Auditor, showing how the company was organized.

There was other evidence of the same kind admitted, and considerable pertinent evidence excluded, but we have stated enough to show the situation. Clearly if these statements are true, and no one disputed them, as the defendants offered no evidence, G. W. Bailey would be liable without the aid of

the statute, Acts 1915, chapter 18, and the jury would have been justified in returning a verdict against him.

There is other evidence showing that the company, when plaintiff bought his stock, was in debt to the amount of at least $2120; that prior to November 17, 1917, J. B. Condon offered to sell ten shares of this promotion stock to George W. Davis; that Condon told him it was worth two for one and that Bailey and Champion were the main parties in the company; that he went to see Bailey about it, and Bailey told him to buy all the stock he could, that it was worth then $150 and he bought ten shares. Other evidence, if permitted to go to the jury, would have further connected Champion with the efforts to sell the stock, and in making similar statements.

The company failed. At the time the suit was brought it had no property and was in debt between $8000 and $10,000, secured by individual endorsers, including some of the defendants. We think that the evidence permitted to go to the jury and the pertinent evidence offered, but rejected, made a prima facie case, entitling the plaintiff to recover against all the defendants under section 7 of the Act.

The object of the act is stated in its title:—"An act to prevent fraud in the sale and disposition of stock, bonds, notes, contracts, or other securities, and certain real estate, sold or offered for sale, within the state of West Virginia and providing penalties for the violation thereof."

Section 1 provides that no person or persons mentioned in section 6 shall as principal or agent promote by advertisement, circular, prospectus, or any other form of public or general offering, inducement or persuasion, the issuance, transfer, distribution, sale or negotiation of any speculative security as defined in section 2, unless prior thereto he or they shall have filed with the Auditor of this state a verified statement containing certain information as therein specified, but bona fide offers made directly to banks, bankers, brokers, or trust companies who deal in such securities are excepted.

Section 2 defines the term "speculative securities" as including all stocks and securities mentioned in section 6 of the act which shall in their subscription, issuance, sale, trans-

fer, negotiation or distribution be represented to yield a profit to the purchaser or other transferee of more than 8 per cent on the price at which they are offered.

Section 3 provides that no person shall promote by advertisement, circular, prospectus or any other form of public or general offering, inducement or persuasion, the issuance, sale, transfer, negotiation or distribution of any of the securities mentioned in section 6 without first having notified the Auditor, describing such securities, and if it shall appear therefrom, or from any investigation which the Auditor is thereby authorized to make, that such information is not sufficient to determine the character and value of such securities, or of such proposition, or of the honesty thereof, then such securities shall be deemed to be speculative under section 2.

Section 4 provides that in case of a person mentioned in section 6, that is, any person, partnership, association or corporation, not yet on a dividend paying basis, if more than $500 in cash, or the equivalent at par in the stocks or securities to be promoted, has been or is to be paid or issued for intangible assets or property taken over by such person, a subscription blank showing the amount of such payment or issue, and such other information in connection therewith as may be deemed necessary by the Auditor, shall be filed with him, and subscriptions or applications for said stocks or securities shall be recognized by such person only when made upon such subscription blank and signed by the subscriber or applicant. The Auditor may require stock or securities, issued or to be issued for property or intangible assets as aforesaid to be deposited in escrow under such terms as he may prescribe. The total promotion expense shall not exceed 10 per cent of the selling price. All the provisions shall apply to both speculative and non-speculative securities.

We can not agree with counsel for defendants that this section applies only to the transfer of intangible assets or intangible property, and hence does not apply to the transfer made by Bailey as Trustee because that was real estate. The statute uses the words "intangible assets or property"

not "intangible assets or intangible property"; and the last clause of sub-section I uses the expression "for property or intangible assets as aforesaid", clearly showing that the term "property" is not limited to "intangible property", but is inclusive and covers all kinds of property, whether real or personal.

This section does not prevent one from transferring property to a corporation, not yet on a dividend paying basis, and receiving more than $500 in cash for such transfer, or from receiving more than $500 in the stocks or securities of the corporation, but if he does receive more than $500 in cash or such stocks and securities, then, in case the stocks or securities of the corporation are to be sold, a subscription blank showing the amount paid for such transfer of property is to be filed with the Auditor, and it is unlawful for any person promoting such sale of stocks or securities to use any other form of subscription blank. This subscription blank then informs the subscriber or purchaser of stock or securities what the promoter has received for the property, and he can not complain if he is over-reached. He goes in with his eyes open.

Section 6 makes it a felony for any person, partnership, association or corporation, doing business within the state, or any or all of the officers or agents thereof, alone or in conjunction with others, having devised or intending to devise any scheme or artifice to defraud any person or persons. by securing subscriptions for, or by promoting or negotiating the issuance, transfer, distribution or sale of any stocks, bonds, notes, contracts, or other securities of any kind or character, and who shall for the purpose of executing or attempting to execute such scheme or artifice commit any overt act within this state.

Section 7 makes it unlawful for any such person, with the intent to induce the purchase of any of such securities as are mentioned in section 6, or of any real estate outside this state, knowingly or recklessly to make any false statement, either oral or written, or knowingly or recklessly to conceal any fact materially affecting the value of any such securities, or of

such real estate, and makes such person liable in damages to any party who has been occasioned loss thereby.

It will be observed that sections 1 and 3 refer to public offerings of securities; while sections 6 and 7 cover transactions both public and private.

Applying the statute to the facts in this case, where do the defendants stand? It was shown that they acquired the Ohio properties for $4400; organized a West Virginia corporation with an authorized capital stock of $50,000; immediately conveyed the property to it and received $25,000 of the stock; authorized the sale of the remaining $25,000 to the public at par, paying the agent 10 per cent commission for making sales, without providing subscription blanks as required by section 4, so as to inform the public what the promoters had paid for their stock; sold to various persons in different amounts stock aggregating over $11,000. Some of this stock, if the testimony is to be believed, and it is not disputed, as the defendants offered no evidence, was sold under the basest kind of mis-representations. In our judgment, this is one of the various kinds of schemes or devices covered by the statute. A favorite method used by promoters to mulct the public is to acquire property, turn it over to a corporation, organized by themselves or by dummies or insiders, at an exorbitant price, accept the corporate stocks or securities therefor, and put value into the stocks or securities received by promoting sales of the remaining stocks or securities owned by the corporation. Such was the scheme or device employed by the promoters, the defendants in this case.

We repeat, the statute does not absolutely forbid this method of promotion. It does not prohibit turning property over to a corporation, not on a dividend paying basis, and receiving therefor more than $500 in cash, stocks or securities; but it does forbid the further sales of the stocks and securities until the subscription blank form, showing the amount paid for such property, has been filed with the Auditor, and the subscriptions taken thereafter must be upon such form, in order to advise the subscriber of the terms upon

which the corporation acquired the property. Section 4 applies to both speculative and non-speculative stocks.

We are referred by counsel for defendants to the case of *Bank* v. *Coal & Coke Co.*, 51 W. Va. 60, 41 S. E. 390; point 3 of the Syllabus says: "The fact that property so received by a corporation in full payment for stock issued is taken at an over-valuation will not make the holder of such stock liable as for unpaid subscription until the transaction has first been impeached for fraud upon the corporation." That case has been frequently criticised; but the court found that the stockholders who promoted the company acted in good faith, and the transactions involved were not only not prohibited, but were expressly sanctioned by statute. When that case was decided, the present statute, Acts 1915, chapter 18, had not been enacted. Had it been, we have no doubt the defendants there would have been required to pay plaintiff's debt.

It is contended here that to uphold the statute results in taking away the freedom of competent persons to contract. By no means does it do this. They may contract as heretofore, but they may not commit fraud as heretofore in the sale of worthless stocks and securities.

Again, they say there was no proof of any scheme or artifice to defraud and that no fraud was shown. We think the statute makes the scheme or artifice shown in evidence at least prima facie fraudulent; it forbids it, makes it unlawful. It makes it the duty of the promoter to disclose to a prospective purchaser of the stocks or securities of the corporation the terms on which he has transferred property to it, if the consideration exceeds $500 in cash or stocks or securities. The company in this case was not on a dividend paying basis at the time of the transfer or afterward. The statute gives any one, who is injured by any such promoter, who knowingly or recklessly makes any false statement, either oral or written, or knowingly or recklessly conceals any fact materially affecting the value of the securities offered for sale, the right to recover from any such promoter, the damages he may have sustained thereby. Defendants might have protected them-

selves had they complied with the statute; this they failed to do.

Another point made is that any representations of defendant G. W. Bailey concerning the financial condition of the company, even if made with intent to induce the purchase of the stock from the corporation are not actionable because of the statute of frauds, the representations not being in writing. This can not be, because section 7 of the statute says any promoter who ''shall knowingly or recklessly make any false statement, either oral or written'' shall be liable to the party injured, clearly exempting such oral representations from the operation of the statute of frauds.

We think that prima facie a scheme or artifice to defraud, within the meaning of the statute, was shown by plaintiff against all the defendants. They jointly launched the scheme and were interested in its promotion, and the declarations made by any one of them, in furtherance of the scheme, though the others were not present, were competent evidence against all parties to it. *Danville Bank* v. *Waddill*, 31 Gratt. (Va.) 469; *Sands* v. *Commonwealth*, 21 Gratt. 871; *State* v. *Grove*, 61 W. Va. 697, 57 S. E. 296. The court erred in excluding such declarations as were detailed by witnesses Engle, Hardwick and Davis.

We do not mean to foreclose all defense. The record now presents but one side of the case. The defendants may have acted in entire good faith and a different situation may be shown when their testimony is heard, but as the record now stands there was ample evidence to support a verdict in favor of plaintiff and it ought to have been submitted to the jury.

For the foregoing reasons, we reverse the judgment, set aside the verdict, and remand the case for a new trial.

*Reversed and remanded.*