# CHARLESTON.

FAYETTE WHOLESALE GROCERY COMPANY *et als. v.* BROWN BROTHERS *et als.*

(No. 5528)

Submitted September 8, 1926.    Decided September 21, 1926.

1. APPLICATION OF STATUTE—

    Sec. 24, Ch. 53, Code, applied.   (p. 184.)

2. LICENSES—*Under Blue Sky Law, No Payment in Money on Stock Issued in Return for Property is Required (Code, c. 53, § 24).*

    Under Sec. 24, *supra,* no payment in money on stock is required.   (p. 185.)

3. CORPORATIONS—*Where Full-paid Stock is Issued for Property Received Under Statute, Actual Fraud Must be Present to Enable Creditors of Corporation to Hold Stockholders Liable (Code, c. 53, §24).*

    Where full paid stock is issued for property received under Sec. 24, *supra,* actual fraud must appear in the transaction to enable creditors of the corporation to hold the stockholders liable.   (p. 186.)

4. LICENSES—*Blue Sky Law Does Not Apply to Transfer of Property to Corporation for Stock (Code, c. 35, § 24).*

    Blue Sky Law has no application to the transfer of prop-

erty to a corporation for stock. *Conway* v. *Bailey,* 91 W. Va. 324, pt. 4 syl. (p. 184.)

5. CORPORATIONS—*One Knowingly Contracting With Corporation Cannot Deny Its Corporate Identity.*

When one knowingly contracts with a corporation as such, he will not afterwards be heard to deny its corporate identity. (p. 187.)

6. SAME—

When a legally organized corporation takes over the business of a partnership, the partners are not liable to subsequent creditors of the corporation, who deal with it as such. (p. 187.)

Appeal from Circuit Court, Fayette County.

Consolidated suits by the Fayette Wholesale Grocery Company and others and by C. R. Radford and others against Brown Brothers and others. From an adverse decree, D. P. Brown and others appeal.

*Reversed and remanded.*

*Dillon & Mahan,* for appellants Brown.

*Osenton & Lee* and *C. R. Summerfield,* for appellees Bigford, Radford, Radford & Bigford, and Abbot.

HATCHER, JUDGE:

On January 12, 1920, F. L. Abbot, B. G. Brown, and Denver Brown, who were equal partners in a small lumber operation, organized a corporation, by name of Brown Brothers and Abbot Lumber Company. The stockholders were the partners and the respective wives of the Browns. The partners then traded the assets of the partnership, subject to its liabilities, to the corporation for its stock of the par value of $10,000.00. Sometime thereafter, the saw mill burned, the corporation became insolvent, and some of the creditors seek in this suit to hold the partners personally liable for the indebtedness of the corporation.

The circuit court of Fayette County found that the debts of the partnership on January 12, 1920, amounted to $10,960.16, of which amount $8,122.13 was subsequently paid by the corporation; that the sale of the partnership assets to the corporation and the issuance of paid up stock of the par

value of $10,000.00 therefor, was a fraud on subsequent creditors of the corporation, and held the partners personally liable to the creditors, to the amount of the said sum of $8,122.13. From this decree the Browns have appealed.

Neither the court nor its commissioner who stated the account, attempted to fix the entire value of the assets of the partnership. These assets consisted of a saw mill and equipment, several horses and wagons, certain timber and logs referred to as the "Kilburn or Sturgeon" timber, cash in banks, lumber on yard, and the timber on the Huddleston 196-acre tract. The commissioner listed the first four items at cost, which amounted to $6258.11 (erroneously stated by the commissioner to be $8136.41) but for some reason not apparent, placed no value on the last two items. There was no dispute as to the quantity or value of the lumber on the yard. According to the testimony of F. L. Abbot, there was 37,000 feet of this lumber, and "They took it as it came from the mill at $48.00 a thousand." The worth of the lumber on the yard was accordingly $1776.00.

Opinions as to the value of the Huddleston timber ranged from $1200.00 to $10,000.00. F. L. Abbot had purchased this timber at public sale in August, 1919, at the price of $3025.00. Sale of the timber was attempted by an agent of Abbott at $4000.00, but no purchaser was found. As property rarely brings its true value at a public sale, the Huddleston timber was likely worth more than Mr. Abbot paid for it, but less than $4000.00. If this timber was worth only $3000.00 on January 12, 1920, it would follow that the assets of the partnership amounted to at least $11,034.11. The assets were therefore of greater value than the liabilities, and there was no fraud perpetrated on the corporation in requiring it to take the one and assume the other. In that transaction the sellers were the purchasers. They sold as a partnership and bought as a corporation. No one, except them, was interested in the price they paid for their own property. If they valued at $20,960.16 property which had a market value of only $11,034.11, who was hurt by their over-estimation? No witness testified that he extended credit to the corporation because of this valuation. There was no proof that the transfer

was made to hinder, delay or defraud the creditors of the partnership. None of those listed as creditors of the partnership on January 12, 1920, are complainants in this suit, except F. L. Abbot, and he does not plead as such creditor.

The lower court seemingly based its finding of fraud on the fact that the partners formed the partnership to avoid personal liability, and that the incorporators failed to comply with the "Blue Sky Law". No complainant now says that he was in any way deceived as to the liability of the partners. None claims that he was led to believe that the individual liability of the partners continued after the corporation was organized. Where no deceit was attempted or accomplished it was certainly not fraudulent for the partners to seek the immunity which the law provides.

As explained in *Conway* v. *Bailey,* 91 W. Va. 324, it is no violation of the Blue Sky Law to transfer property to a corporation in exchange for stock of the corporation, "but it is the sale of stocks and securities therein afterwards, without furnishing the information required by the statute which is prohibited". No sale of the corporation stock was made. Consequently the Blue Sky Law has no application here.

This case falls within the provisions of Sec. 24, Ch. 53, Code, which is in part as follows:

> "Nothing herein contained shall be so construed as to prevent any mining or manufacturing corporation subject to the provisions of this chapter, from issuing stocks or bonds, and negotiating the sale of same, in payment of real and personal estate for the use of such corporation, and for its other corporate purposes and business, at such price and upon such terms and conditions as may be agreed upon by the owners and the directors or stockholders of such corporation. And any subscriber to the capital stock of any such mining or manufacturing corporation may pay for the same by the transfer and conveyance to such corporation of real or personal property, or both, proper or necessary for the uses and purposes of the corporation upon such terms as may be mutually agreed upon. All stock so issued shall be fully paid and not liable to any further call or assessment, and in the

> absence of actual fraud in the transaction, the
> valuation of the property so purchased shall be
> conclusive; but it shall be the duty of the corpora-
> tion to have its minutes or other permanent records
> to show with reasonable detail the items of the
> property in payment for which stock or bonds
> were so issued."

The attorney of the corporation unthoughtedly destroyed the minutes of the corporation after the saw mill burned. His testimony on the organization of the corporation is: "I was employed by the two Browns and Mr. Abbot to incorporate the company for them and after I secured the charter I called them together for the first meeting of the stockholders and directors, the three men and myself met in my office soon after receiving the charter and the first meeting of the stockholders was held at that time and the directors were elected, composed of these three men and Mrs. Bert Brown and Mrs. Denver Brown, and there was a resolution adopted accepting a proposition of Brown Brothers and Abbot, a partnership, to buy from the partnership the assets. My recollection is they were all set out, all that standing timber on the 196 acre tract, a saw mill and its equipment and some lumber on the yard and cash in bank and the resolution provided that the corporation agreed to buy it all for $10,000.00 of its capital stock. Later the directors had their meeting at the same time and Bert Brown was elected President, Denver Brown, Secretary Treasurer, and Mr. Abbot elected General Manager. * * * The by-laws were prepared at the stockholders meeting, and were adopted, and I might say the by-laws were in printed form in this book and all we had to do was to fill out the blank lines according to the facts. I was appointed power of attorney at the meeting and it was written up and the power of attorney sent here for recordation and also to the Secretary of State's office. I was instructed to mail the charter up here to be recorded, which I did." This evidence was not disputed and shows there was a substantial compliance with the requirement of the statute that the minutes exhibit with reasonable detail the items of

the property in payment for which stock was issued. No fraud was proven and in the absence of actual fraud the valuation of the property purchased is by the statute made *conclusive. Bank* v. *Belington C. & C. Co.,* 51 W. Va. 60. "Under Acts W. Va. 1882, Ch. 96, Sec. 24, a sale of corporate stock for property cannot be questioned in the absence of fraud; therefore corporate creditors in such case cannot hold subscribers liable on the theory that their subscriptions were unpaid, because the property was received at a valuation fixed between them and the corporation". *Maryland Rail Co.* v. *Taylor,* 231 Fed. 119.

By the express terms of the statute the stock received by the partners is "fully paid and not liable to any further call or assessment." Therefore the stockholders as such are not liable to the subsequent creditors of the corporation. Our statute is merely declaratory of the Common Law. "At common law corporate creditors cannot hold stockholders liable on stock which has been issued for property, even though the property was turned over to the corporation at an agreed valuation which was largely in excess of the real value of the property." Cook on Corporations, 8 Ed., par. 45*a.* There is no evidence that the creditors of the corporation were misled by the stockholders as to the method by which payment for the stock was made. The rule in such cases pronounced by the Supreme Court of the United States has met with general approval by the state courts. "Where the charter authorizes capital stock to be paid in property, and the stockholders honestly and in good faith put in property instead of money in payment of their subscriptions, third parties have no ground of complaint. The case is very different from that in which subscriptions to stock are payable in cash, and where only a part of the installments has been paid. In that case there is still a debt due to the corporation, which, if it become insolvent, may be sequestered in equity by the creditors, as a trust fund liable to the payment of their debts. But where full paid stock is issued for property received, there must be actual fraud in the transaction to enable creditors of the cor-

poration to call the stockholders to account." *Coit* v. *Gold Am. Co.,* 119 U. S. 345.

Counsel for appellees raise the point that 10% of the stock taken was not paid. Presumably counsel mean that such payment was not made *in cash.* Payment in cash was not necessary in this case, as the statute specifically authorizes payment for stock in property. If the valuation placed on the property by the stockholders is conclusive, then it would appear that the entire stock issue was paid for in property and there are *no unpaid stock subscriptions.*

Counsel also complain that no notice was given by the partners to creditors of the sale of their property to the corporation. This arraignment has no application to this case, as no creditor is claiming that he dealt with the corporation under the belief that it was a partnership.

Counsel cite *Nimick* v. *Mingo Iron Works Co.,* 25 W. Va. 184, as a case holding stockholders liable for the indebtedness of the corporation. The defendant corporation in that case was an Ohio corporation. The Ohio statute imposed personal liability on the stockholders. Hence the decision. Counsel also stress the case of *Vreeland* v. *N. J. Stone Co.,* 29 N. J. Eq. 188. In that case contracts of subscription to corporate stock were set aside because procured by fraud, the court forcefully holding that "Whatever fraud creates justice will destroy". Fraud is based on misrepresentation and deceit. When there is a total lack of proof of misrepresentation and deceit, as in this suit, the New Jersey case is not in point.

Counsel further charge that the corporate organization was invalid. This charge is refuted by the testimony of the attorney for the company, from which it appears that the customary and requisite formalities of corporate organization were observed. Even if the organization had been defective, complainants are in no position to profit thereby. The report of the commissioner states: "The said firm was dealt with and considered as a corporation by all the parties to this suit." There was no exception to this finding, consequently we accept it as correct. The law is settled that when one contracts with an organization as a corporation, he will not

afterwards be permitted to deny its corporate identity, no misrepresentation being shown. *Singer Mfg. Co.* v. *Bennett,* 28 W. Va. 16; *Bond Aqua Co.* v. *Standard Co.,* 34 W. Va. 764; 8 A. & E. Ency. Law, 760; 7 R. C. L. 105; 14 C. J. 231. "The great weight of authority has clearly established the rule that, where a supposed corporation is doing business as a *de facto* corporation, the stockholders cannot be held liable as partners, although there have been irregularities, omissions, or mistakes in incorporating or organizing the company. The corporation is a *de facto* corporation where there is a law authorizing such a corporation and where the company has made an effort to organize under the law and is transacting business in a corporate name. * * * This conclusion of the law is reasonable and just. There is no reason why parties who have dealt with a corporation as a corporation should afterwards be allowed to claim more than they originally bargained for, and to hold the stockholders personally liable. Such is the established rule beyond reasonable doubt." Cook on Corp., par. 234.

The exemption from liabilities of partners, as such, after incorporation is well expressed in 14 C. J. 307: "the partners will not be liable on contracts entered into or for debts contracted by the corporation or in the corporate name after incorporation, unless the other party dealt with them as partners, and did not have actual or constructive notice of their incorporation, or unless there has been such a failure to legally incorporate prior to the making of the contract or the contracting of the debt as to render the partners individually liable under the principles noted in a preceding chapter."

The complainants did not deal with the company as a partnership, but as a corporation and there was no failure to legally incorporate under Sec. 24, Ch. 53, Code.

The decree of the lower court holding the partners personally liable for the debts of the corporation to the extent of $8,122.13, will therefore be reversed, and the cause remanded.

*Reversed and remanded.*